2007 OK CR 17

Tremane WOOD, Appellant

v.

STATE of Oklahoma, Appellee.

No. D–2005–171.

Court of Criminal Appeals of Oklahoma.

April 30, 2007.

---

Johnny Albert, Lance Phillips, Attorney at Law, Oklahoma City, OK, attorneys for Wood at trial.

Perry W. Hudson, Jason J. Spanich, Attorney at Law, Oklahoma City, OK, attorneys for appellant on appeal.

Fern Smith, George Burnett, Asst. District Attorneys, Oklahoma City, OK, attorneys for the state at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

A. JOHNSON, J.

¶ 1 Tremane Wood[1] was tried by jury in the District Court of Oklahoma County, Case No. CF–2002–46, and was found guilty of Count 1—First Degree Felony Murder in violation of 21 O.S.2001, § 701.7(B), Count 2—Robbery with Firearms, After Former Conviction of a Felony in violation of 21 O.S.2001, § 801, and Count 3—Conspiracy to Commit a Felony, After Former Conviction of a Felony in violation of 21 O.S.2001, § 421. The jury recommended the death penalty on Count 1 after finding that Tremane knowingly created a great risk of death to more than one person, that the murder was especially

---

1. Wood's first name is spelled inconsistently throughout the record as either "Termane" or "Tremane." Wood's brief-in-chief and reply brief are captioned with the name "Tremane."

Copies of his birth certificate and social security card contained in an exhibit use "Tremane." Accordingly, this opinion adopts the spelling "Tremane."

heinous, atrocious, or cruel, and that Tremane posed a continuing threat to society. *See* 21 O.S.2001, §§ 701.12(2), (4) and (7). The jury fixed his punishment on Counts 2 and 3 at life imprisonment. The Honorable Ray C. Elliott, who presided at trial, sentenced him accordingly and ordered the sentences to be served consecutively. From this Judgment and Sentence, he appeals raising seven claims of error. We find none of these claims merit relief and affirm his judgment and sentence.[2]

## I. FACTS

¶ 2 Appellant Tremane Wood and three others were involved in and charged with the murder of Ronnie Wipf and the robbery of Arnold Kleinsasser. Clarity requires us to set forth the relationship between these defendants and the outcome of their cases. In addition to Tremane Wood, the defendants include Tremane's older brother Zjaiton Wood, Zjaiton's girlfriend Lanita Bateman, and the mother of one of Tremane's sons, Brandy Warden.[3] Brandy Warden entered into a plea agreement, cooperated with the State and testified against her co-defendants. She pled guilty to Accessory After the Fact and Conspiracy.[4] Zjaiton and Lanita were each found guilty in separate trials of felony murder, robbery with firearms, and conspiracy.[5]

¶ 3 On New Years Eve 2001, Ronnie Wipf and Arnold Kleinsasser went to the Bricktown Brewery in Oklahoma City where Zjaiton, Tremane, Lanita and Brandy were celebrating. Near closing time, Wipf and Kleinsasser met Lanita and Brandy believing they were two ordinary girls celebrating the new year together. Lanita and Brandy agreed to accompany Wipf and Kleinsasser to a motel on the pretext of continuing to celebrate the new year. Brandy, Lanita, Tremane, and Zjaiton then made a plan whereby the women would pretend to be prostitutes and the brothers Wood would arrive at the motel later and rob Wipf and Kleinsasser.

¶ 4 Once in their room at a Ramada Inn, Lanita made a telephone call to Zjaiton to let him know where they were, ending her conversation by saying, "Mom, I love you" so the victims would not be suspicious. The call to "Mom" was followed by some general conversation among the four which included a discussion of what each did for a living. Lanita told Kleinsasser that "this" is what she did and he realized that she meant she earned her living by having sex with men. That revelation was followed by a negotiation whereby the two women agreed to have sex with Wipf and Kleinsasser for $210.00. Since neither man had that much money, Brandy drove Kleinsasser to a nearby ATM. He gave her the money he withdrew and they returned to the room.

¶ 5 Back at the motel, the women went into the bathroom together, and shortly after, someone pounded on the door and called out, "Brandy, are you in there? Brandy, are you ready to go home?" Wipf refused to open the door and urgently told Kleinsasser to call the police. Before he could reach the phone, Lanita picked it up and pretended to call the police. Since it was now clear that the women were not going to have sex with them, Wipf demanded the return of their money.

---

**2.** Tremane Wood's Petition in Error was filed in this Court on February 22, 2005. His brief-in-chief was filed on June 28, 2005, and the State's answer brief was filed on July 22, 2005. A reply brief was filed on August 11, 2005. The case was submitted to the Court on July 29, 2005. The case was remanded to the District Court for an evidentiary hearing on November 16, 2005. The District Court filed its Findings of Fact and Conclusions of Law on April 6, 2006. Oral argument was held on November 28, 2006.

**3.** Brandy had previously dated Tremane, but was not in a romantic relationship with him at the time this crime was committed.

**4.** The district court sentenced her to 45 years for accessory after the fact and 10 years for conspiracy.

**5.** Zjaiton Wood was sentenced to life imprisonment without the possibility of parole for felony murder and 60 years imprisonment for robbery and conspiracy. This Court affirmed his convictions in *Wood v. State*, Case No. F–2005–246 (Okl.Cr., Dec. 20, 2006)(unpublished opinion). Lanita Bateman was sentenced to life imprisonment for felony murder, 101 years imprisonment for robbery and 10 years imprisonment for conspiracy. This Court affirmed her convictions in *Bateman v. State*, Case No. F–2003–647 (Okl.Cr., April 19, 2004) (unpublished opinion).

After a brief period of pandemonium in the room, Wipf opened the door and the women ran out. Recognizing a white car as the one Zjaiton and Tremane were driving, they got in and waited. Meanwhile, two masked men rushed into the motel room, a larger man, subsequently identified as Zjaiton Wood, holding a gun and a smaller man, subsequently identified as Tremane Wood, brandishing a knife.[6] Zjaiton pointed the gun at Kleinsasser's head and demanded money. Kleinsasser gave him the rest of the money in his wallet. Zjaiton then joined Tremane in his attack on Wipf. As the three struggled, Kleinsasser heard one of the intruders say, "Just shoot the bastard" and then a gunshot. Tremane then turned his attention to Kleinsasser, demanding more money. Kleinsasser showed him his empty wallet, and Tremane hit him on the head with the knife. Tremane rejoined the struggle with Wipf and the fight moved into the bedroom area. Kleinsasser could see Wipf was bleeding and knew that he was seriously injured. While the two intruders struggled with Wipf, Kleinsasser escaped and sought help from the motel office. Before anyone could unlock the office door and help him, however, Kleinsasser fled to a nearby apartment complex to hide. From his vantage point there, he watched the motel and saw a white car leave the parking lot. He saw people come and go throughout the night, but, with no sense of whom they were, remained in hiding. It was 6:00 a.m. before he returned to the scene of the attack and learned of Wipf's death from a police detective.

¶ 6 The medical examiner concluded that Wipf died as the result of a stab wound to the chest. There was no evidence he had sustained any kind of gunshot wound. Surveillance videotape from the motel's camera showed Brandy and Lanita renting the room with Wipf and Kleinsasser. The motel's phone records showed that three calls were made from the room to Zjaiton's pager and one to the house where Tremane lived. Surveillance videotape from a local Wal–Mart showed Brandy, Lanita, Zjaiton, and Tremane buying ski masks and gloves earlier in the evening.[7] As part of her plea bargain, Brandy testified against Tremane detailing the events of the evening from buying the masks and gloves through their actions the morning after the murder.

¶ 7 Zjaiton testified for the defense, against the advice of counsel. He said that it was he who stabbed Wipf, aided in the crime by a man named Alex. Zjaiton claimed that he took the knife from Alex and stabbed Wipf with it. He testified that Tremane was not involved in the crime.

## II. FIRST STAGE ISSUES

¶ 8 In his first proposition, Tremane argues that his felony murder conviction must be reversed because the State failed to prove that he or anyone engaged with him attempted to rob Wipf. This Court reviews the trial evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Garrison v. State*, 2004 OK CR 35, ¶ 61, 103 P.3d 590, 603. We accept all reasonable inferences and credibility choices that support the jury's verdict and must affirm the conviction so long as from the inferences reasonably drawn from the record evidence the jury might fairly have concluded the defendant was guilty beyond a reasonable doubt. *Davis v. State*, 2004 OK CR 36, ¶ 22, 103 P.3d 70, 78.

¶ 9 To convict Tremane of felony murder, the State had to prove beyond a reasonable doubt that Wipf was killed while Tremane or someone engaged with him was wrongfully

---

6. Kleinsasser could not identify his attackers because they remained masked throughout the entire incident so he described the men's actions distinguishing the men by their size. Zjaiton is the larger of the Wood brothers. According to their mother's estimates, Zjaiton is the taller of the two brothers and outweighs Tremane by some 50 pounds, making him easily distinguishable from Tremane.

7. Prior to going to the Bricktown Brewery, Zjaiton and Tremane robbed a local pizza restaurant and attacked the owner, wearing the masks and gloves they had just purchased and using the gun and knife that they later used in the robbery-murder at the Ramada Inn. According to the restaurant owner, the smaller man had the knife and the larger man had the gun.

attempting to take and carry away Wipf's personal property from either his person or immediate presence by force or fear through the use of a gun or some other type of dangerous weapon. The trial evidence showed that Tremane and his brother Zjaiton devised a plan with Lanita and Brandy to rob Wipf and Kleinsasser at the motel. Kleinsasser, the surviving victim, testified that two men rushed into the motel room brandishing a gun and a knife and demanded money. Although the focus of his testimony about the robbery was on the demands made to him by Zjaiton, and later by Tremane, a rational jury could reasonably conclude that the same demands were being made of Wipf. The fact Tremane became involved in a struggle with Wipf at the same time Zjaiton was robbing Kleinsasser supports a finding that Wipf tried to resist Tremane's attempt to rob him. During his trial testimony, Kleinsasser noted that at one point the larger man with the gun (Zjaiton) went to aid the smaller man (Tremane) who was "robbing" Wipf. In addition to Kleinsasser's testimony, Zjaiton testified that he and his accomplice went to the motel to rob the men. He admitted that he robbed Kleinsasser and that his accomplice struggled with Wipf. While Zjaiton tried to implicate someone he called "Alex" as his accomplice instead of his brother, the evidence from Brandy and Casey Odell (Tremane's girlfriend) refuted that claim and provided the necessary evidence to show that it was Tremane who committed the crime with Zjaiton. On this record the jury was justified in finding that both Tremane and Zjaiton entered the motel room with the intent to rob both Wipf and Kleinsasser and that Tremane assaulted Wipf in an attempt to rob him. Tremane's felony murder conviction is supported by sufficient evidence.

## III. SECOND STAGE ISSUES

### A.

¶ 10 In his second proposition, Tremane argues that it was error for the jury to consider punishment for both capital murder and non-capital offenses during the second stage of his bifurcated trial. He contends the jury's exposure to aggravating evidence introduced solely to fix his punishment for capital murder during his capital sentencing proceeding caused the jury to impose harsher sentences for his non-capital crimes. Tremane argues in his brief that his non-capital offenses should have been tried to guilt or innocence and punishment in the first stage of trial using the procedure outlined in *Perryman v. State*, 1999 OK CR 39, ¶ 14, 990 P.2d 900, 905. At oral argument, however, appellate counsel advocated that the proceeding should have been trifurcated. Regardless, Tremane did not object to the procedure utilized below; review is for plain error only. *Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923, *cert. denied*, —— U.S. ——, 127 S.Ct. 994, 166 L.Ed.2d 751 (2007). To be entitled to relief under the plain error doctrine, Tremane must prove: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. *Id.*

¶ 11 *Perryman* set forth the procedure to be used when a defendant is charged with both capital murder and non-capital felonies for which the State does not seek to enhance punishment by proof of prior conviction(s). *Perryman*, 1999 OK CR 39, ¶ 14, 990 P.2d at 905. *Perryman* is not controlling when the State seeks to enhance the defendant's non-capital felonies and those non-capital felonies are tried together with a charge of capital murder. *See Williams v. State*, 2001 OK CR 9, ¶ 42, 22 P.3d 702, 715. In *Williams*, we rejected the appellant's claim that the trial court erred in denying a motion to trifurcate his trial on a charge of capital murder and a non-capital felony that the State sought to enhance. *Id.*, 2001 OK CR 9, ¶ 43, 22 P.3d at 715–16. In that case, we held that the bifurcated procedure used was not prohibited by statute[8] and that ap-

---

8. *See* 22 O.S.1991, § 860 (now 22 O.S.Supp. 1999, § 860.1) (requires a bifurcated trial for second and subsequent offenses in which evidence of former convictions is to be admitted) and 21 O.S.Supp.1992, § 701.10 (provides for a separate sentencing proceeding upon conviction of first degree murder when the death penalty is an option).

propriate limiting instructions eliminated any potential prejudice.[9] *Id.*

¶ 12 The State sought to enhance Tremane's non-capital offenses with proof of a prior conviction and Tremane stipulated to his prior conviction during the second stage. Under 22 O.S.2001, § 860.1 and 21 O.S.2001, § 701.10, separate sentencing proceedings were required and the procedure used here is not prohibited by law. The trial court's instructions below were not as explicit as those given in *Williams*. That lack of specificity, however, does not require a different result in this case. The instructions given to Tremane's jury were the uniform death penalty instructions. These instructions discuss the jury's consideration of aggravating circumstances exclusively in relation to its decision concerning the death penalty and the punishment for first degree murder. In addition, the State relied for the most part on the evidence presented during the first stage of trial to support the aggravating circumstances and the death penalty in this case. The only evidence in addition to Tremane's prior conviction the jury heard in second stage related to the "continuing threat" aggravating circumstance and consisted of evidence that Tremane and Zjaiton committed a robbery at a local pizza restaurant before committing the crimes in this case.[10] The fact that the jury imposed the maximum sentence of life imprisonment for Tremane's non-capital felonies in this case is not proof that the jury was unfairly prejudiced by evidence of this other robbery.[11] The crimes Tremane committed are deserving of lengthy sentences and his sentences are not consider-

ably different from those imposed by other juries in his co-defendants' cases. Consequently, we find that Tremane has not shown that the jury fixed harsher punishments on his non-capital felonies as a result of the evidence admitted in second stage given the instructions and evidence in this case. This claim is denied.

## B.

¶ 13 In his third proposition, Tremane argues that multiple errors committed in the second stage of trial denied him a fair sentencing proceeding.

### 1.

¶ 14 Tremane claims his death sentence should be vacated or modified on grounds that aggravating circumstances were not charged in an information or indictment and were therefore not subjected to adversarial testing in a preliminary hearing or determined to probably exist by a neutral and detached magistrate. Like many other defendants in capital cases who have raised this claim, his arguments are based upon the United States Supreme Court's decisions in *Ring v. Arizona*,[12] *Apprendi v. New Jersey*[13] and *Jones v. United States*.[14] He argues that according to the Supreme Court aggravating circumstances are the functional equivalent of an element of a greater offense and as such they must be charged in an indictment or information and be presented and established at a preliminary hearing to comport with Oklahoma law and due process.

---

9. Williams's jury was specifically instructed that in reaching its decision on punishment for the non-capital offense, it was to consider only the evidence incorporated from the first stage and evidence pertaining to the prior convictions. The jury was specifically instructed not to consider the victim impact evidence or evidence supporting the aggravating circumstances. The jury was further instructed as to the prior convictions alleged by the State and the State's burden of proof beyond a reasonable doubt.

10. No victim impact evidence was presented during the second stage and thus, the jury's sentencing decision on Tremane's non-capital felonies could not have been affected by that type of evidence.

11. The State submitted during argument that the decision to forgo requesting a trifurcated proceeding was a strategic one because the jury would not have had the benefit of any mitigating evidence before assessing punishment for Tremane's non-capital crimes and would have seen Tremane only as a convicted felon who committed a senseless crime with grave consequences. This point has merit.

12. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

13. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

14. 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

Otherwise, the district court never acquires jurisdiction to conduct a capital sentencing proceeding.

¶ 15 This Court has consistently rejected this same claim and we find nothing in Tremane's brief to convince us that our prior decisions on this issue are wrong. *See Rojem v. State,* 2006 OK CR 7, ¶¶ 66–67, 130 P.3d 287, 300; *Davis v. State,* 2004 OK CR 36, ¶¶ 44–46, 103 P.3d 70, 82–83; *Thacker v. State,* 2004 OK CR 32, ¶¶ 9–22, 100 P.3d 1052, 1055–57; *Primeaux v. State,* 2004 OK CR 16, ¶¶ 14–16, 88 P.3d 893, 899–900. No relief is required.

¶ 16 Tremane contends that his rights to due process and trial by jury were violated by the trial court's failure to instruct the jury that the death penalty could not be imposed unless the jury first found that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. This Court has repeatedly rejected this claim. *Browning v. State,* 2006 OK CR 8, ¶ 57, 134 P.3d 816, 845, *cert. denied,* ── U.S. ──, 127 S.Ct. 406, 166 L.Ed.2d 288 (2006); *Rojem,* 2006 OK CR 7, ¶¶ 59–60, 130 P.3d at 299; *Jones v. State,* 2006 OK CR 5, ¶ 109, 128 P.3d 521, 551, *cert. denied,* ── U.S. ──, 127 S.Ct. 404, ── L.Ed.2d ── (2006); *Torres v. State,* 2002 OK CR 35, ¶ 6, 58 P.3d 214, 216. These cases are dispositive.

### 3.

¶ 17 Tremane argues that his jury should have been further instructed on the sentencing options of life imprisonment and life imprisonment without the possibility of parole. He did not object to the trial court's instructions; his failure to do so forfeits any error unless he can show plain error. *Hogan,* 2006 OK CR 19, ¶ 38, 139 P.3d at 923.

¶ 18 The trial court did not commit error, plain or otherwise, by not instructing Tremane's jury on the meaning of life imprisonment and life imprisonment without parole. This Court has taken the position that the three punishment options for first degree murder (death, life imprisonment without the possibility of parole and life imprisonment with the possibility of parole) are self-explanatory. *Littlejohn v. State,* 2004 OK CR 6, ¶ 8, 85 P.3d 287, 292. Instructing a capital sentencing jury on the three statutory punishment options, with their obvious distinctions, is sufficient to satisfy the due process concerns addressed in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality). *Id.* There is no indication in this case that the jury was confused about the sentencing options set forth in the jury instructions for first degree murder. On this record, Tremane has not shown any error in the court's instructions necessitating relief.

### 4.

¶ 19 Tremane maintains that the "continuing threat" aggravating circumstance is vague and overly broad on its face and as applied in violation of the Eighth and Fourteenth Amendments of the United States Constitution. He recognizes that this Court has consistently rejected attacks upon the constitutionality of this aggravating circumstance,[15] but asks us to reconsider this position. By failing to cite any intervening case law or new argument to warrant reconsidering this issue, we find our previous decisions upholding the constitutionality of the "continuing threat" aggravating circumstance are controlling on this issue.

### 5.

¶ 20 Tremane argues that the "especially heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally vague as defined by this Court. He acknowledges the position taken by this Court in the past upholding this aggravator, but again asks us to reconsider our prior holdings. We continue to find that this aggravator, as narrowed by this Court, is constitutional and decline to further reconsider the issue at this time.[16]

15. *E.g. Myers v. State,* 2006 OK CR 12, ¶ 87, 133 P.3d 312, 333–34; *Rojem,* 2006 OK CR 7, ¶ 74, 130 P.3d at 301.

16. *Mitchell v. State,* 2006 OK CR 20, ¶ 104, 136 P.3d 671, 711; *Browning,* 2006 OK CR 8, ¶¶ 52– 56, 134 P.3d at 843–45; *DeRosa v. State,* 2004 OK CR 19, ¶¶ 91–93, 89 P.3d 1124, 1154–55.

### 6.

¶ 21 Tremane contends that the jury's finding that the murder was "especially heinous, atrocious, or cruel" is not supported by the record because the incident lasted only a few minutes and there is neither evidence of gratuitous violence inflicted on the victim beyond the act of killing nor evidence of extreme mental cruelty lasting a significant period of time prior to Wipf's death. He further argues that the evidence shows that it was Zjaiton who inflicted any harm suffered by Wipf prior to his death, and that this Court does not impute responsibility to a defendant for the actions of a co-defendant for purposes of assessing the sufficiency of the evidence for this aggravator.

¶ 22 "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." *Harris v. State*, 2004 OK CR 1, ¶ 53, 84 P.3d 731, 751. This Court upholds a jury's finding of the "especially heinous, atrocious, or cruel" aggravating circumstance when it is supported by proof of conscious serious physical abuse or torture prior to death; evidence that a victim was conscious and aware of the attack supports a finding of this aggravator. *Davis*, 2004 OK CR 36, ¶ 39, 103 P.3d at 81; *Black v. State*, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074.

¶ 23 Kleinsasser testified that while Zjaiton pointed a gun at his head and robbed him, Tremane, armed with a knife, struggled with Wipf.[17] Zjaiton later joined Tremane in the attack, and both men struggled with Wipf who was screaming. Just before Kleinsasser fled the room, the struggling men moved closer to him and he could see blood all over Wipf's body. He never saw Zjaiton and Tremane switch weapons. Photographs depicting Wipf's injuries from being beaten and stabbed were admitted. Wipf also had defensive wounds (cuts) on his hands, showing that he was consciously resisting his attackers by putting his hands up in an effort to ward off blows and knife jabs. The fatal stab wound penetrated five inches into Wipf's chest; he eventually died from blood loss caused by this wound. The evidence showed that both Zjaiton and Tremane struggled with Wifp individually and together. Any rational jury could find beyond a reasonable doubt that Wipf's death was preceded by serious physical abuse, while he was still conscious, and that Tremane inflicted a significant portion of the harm done to him. The aggravator that the murder was especially heinous, atrocious, or cruel is supported by sufficient evidence. This claim is denied.

### 7.

¶ 24 Tremane claims the trial court's misdefinition of the "especially heinous, atrocious, or cruel" aggravating circumstance failed to adequately channel the jury's discretion. He failed to object to the trial court's instructions; review is for plain error only. *Hogan*, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.

¶ 25 Tremane is correct that the trial court erred in instructing the jury that a finding of the "heinous, atrocious, or cruel" aggravator required a finding of only "serious abuse" rather than "serious physical abuse." *See Malicoat v. State*, 2000 OK CR 1, ¶ 26, 992 P.2d 383, 400; *Lambert v. State*, 1999 OK CR 17, ¶¶ 64–66, 984 P.2d 221, 238–39; *Miller v. State*, 1998 OK CR 59, ¶ 68, 977 P.2d 1099, 1112–13; *Turrentine v. State*, 1998 OK CR 33, ¶¶ 65–67, 965 P.2d 955, 975; *Mollett v. State*, 1997 OK CR 28, ¶ 56, 939 P.2d 1, 14; *Johnson v. State*, 1996 OK CR 36, ¶¶ 37–42, 928 P.2d 309, 318; *Richie v. State*, 1995 OK CR 67, ¶¶ 42–43, 908 P.2d 268, 278; OUJI–CR2d 4–73. In each of the cases where this error has occurred, however, we have found that the omission of the word "physical" did not rise to the level of plain error because the omission did not alter the burden of proof. *See Malicoat*, 2000 OK CR 1, ¶ 26, 992 P.2d at 400; *Lambert*, 1999 OK

---

17. As noted in note 6, supra, Kleinsasser could not identify his attackers and described them by size. The evidence proved that the larger man with the gun was Zjaiton and the smaller man with the knife was Tremane.

CR 17, ¶ 66, 984 P.2d at 239; *Miller*, 1998 OK CR 59, ¶ 68, 977 P.2d at 1112–13; *Turrentine*, 1998 OK CR 33, ¶ 67, 965 P.2d at 975; *Mollett*, 1997 OK CR 28, ¶ 56, 939 P.2d at 14; *Johnson*, 1996 OK CR 36, ¶ 42, 928 P.2d at 318; *Richie*, 1995 OK CR 67, ¶ 43, 908 P.2d at 278. We need not revisit that determination because the State's evidence, particularly the photographs, clearly showed that Wipf suffered serious physical abuse prior to his death.[18]

### 8.

¶ 26 Tremane next challenges the constitutionality of the "great risk of death to more than one person" aggravating circumstance. He contends the aggravator is vague and overly broad and that this Court has failed to adequately define it and narrow its application. We disagree. This Court has upheld this aggravator in numerous cases and found it to withstand constitutional challenge. *E.g. Jackson v. State*, 2006 OK CR 45, ¶ 63, 146 P.3d 1149, 1167–68; *Matthews v. State*, 2002 OK CR 16, ¶ 47, 45 P.3d 907, 922. Tremane offers no new argument or authority to warrant revisiting the issue in this case.

### 9.

¶ 27 Tremane argues that the trial evidence was insufficient to support the jury's finding that he "knowingly created a great risk of death to more than one person." He contends that neither he nor his brother attempted to do substantial harm to Kleinsasser and that he was not at a great risk of being killed during the attack on Wipf. We review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *DeRosa*, 2004 OK CR 19, ¶ 85, 89 P.3d at 1153.

¶ 28 To determine if a defendant knowingly created a great risk of death to more than one person, this Court reviews the evidence to determine if the defendant's conduct endangered someone other than the deceased in close proximity, in terms of time,

location, and intent to the murder. *Harris*, 2004 OK CR 1, ¶ 53, 84 P.3d at 751; *Matthews*, 2002 OK CR 16, ¶ 45, 45 P.3d at 922. Liability for this aggravating circumstance can attach for a co-defendant's act that a defendant has aided and abetted. *Matthews*, 2002 OK CR 16, ¶ 45, 45 P.3d at 922. Under these standards, the evidence here was sufficient.

¶ 29 Tremane and Zjaiton conspired to rob at knifepoint and gunpoint Wipf and Kleinsasser. When Wipf opened the door of the motel room, Tremane and Zjaiton rushed in and confronted their victims. Zjaiton pointed his gun at Kleinsasser's head and took his money. Wipf resisted and struggled with Tremane by the sink, fending off blows and knife jabs. When Zjaiton joined Tremane in the struggle with Wipf, Tremane told Zjaiton to shoot Wipf. Shortly thereafter Kleinsasser heard a gunshot and smelled burning gunpowder. Tremane then confronted Kleinsasser and hit him on the head with the knife when he produced an empty wallet. The struggle with Wipf occurred only a few feet from Kleinsasser in the small motel room. Any rational jury could have found that Tremane and Zjaiton's conduct during the robbery and murder put Kleinsasser at great risk of death. This claim is denied.

### C.

¶ 30 In his fifth proposition, Tremane contends that this Court should vacate his death sentence and hold that the Oklahoma death penalty scheme is unreliable, that under its current procedures the risk is too great that innocent people may be executed, and that evolving standards of decency render the death penalty unconstitutional.

¶ 31 The Eighth Amendment prohibits the infliction of cruel and unusual punishment.[19] "Whether a punishment is considered cruel and unusual is viewed through 'the evolving standards of decency that mark the

---

**18.** We remind trial courts to use the uniform instructions and use the phrase "serious physical abuse".

**19.** U.S. Const. amend. VIII.

progress of a maturing society.' " [20] This Court looks at whether the punishment at issue is proportionate to the offense, offends contemporary standards of decency, and has legitimate punishment objectives.[21]

¶ 32 The legislature sets the punishment for crimes and has included capital punishment as a possible sentence for first degree murder. 21 O.S.Supp.2004, § 701.9. The United States Supreme Court has upheld those death penalty statutes that channel the jury's discretion to determine which defendants are eligible for the death penalty and, yet, allow the jury the freedom to take into consideration the unique characteristics of each defendant and crime.[22] *Cheney v. State,* 1995 OK CR 72, ¶ 9, n. 7, 909 P.2d 74, 78, n. 7. Over the years, the Supreme Court has narrowed the classes of offenders eligible for the death penalty.[23]

■■■ ¶ 33 We are charged with reviewing the cases of those who are convicted in Oklahoma to ensure that they received a fair trial and were afforded their constitutional rights, especially in capital cases because the death penalty is different from all other penalties in its severity and finality. *Salazar v. State,* 1993 OK CR 21, ¶ 38, 852 P.2d 729, 739. We understand that capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution. *See Cheney,* 1995 OK CR 72, ¶ 9, 909 P.2d at 78. We further understand that it is our job to make sure that narrow and precise definition is given to the statutory aggravating circumstances that can result in a capital sentence if Oklahoma's sentencing scheme is to remain constitutional. *Id.*

¶ 34 Tremane has not shown that he was denied a fair trial or any constitutional right. Nor has he shown that the aggravating circumstances found by his jury were erroneously defined to his detriment or misapplied or that Oklahoma's capital punishment scheme violates any of the Supreme Court's constitutional mandates. For these reasons, we decline to hold that the death penalty scheme in Oklahoma is unconstitutional.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

### A.

¶ 35 In his fourth proposition, Tremane claims that he was denied his Sixth Amendment right to effective assistance of trial

---

**20.** *Malicoat v. State,* 2006 OK CR 25, ¶ 6, 137 P.3d 1234, 1236 (*quoting Roper v. Simmons,* 543 U.S. 551, 561, 125 S.Ct. 1183, 1190, 161 L.Ed.2d 1 (2005)).

**21.** *Malicoat,* 2006 OK CR 25, ¶ 6, 137 P.3d at 1236.

**22.** The *Cheney* Court explained the history of the Supreme Court's cases concerning the constitutionality of death penalty statutes:

In 1972, the Supreme Court outlawed the then-existing death penalty statutes. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The Court found these statutes allowed the jury unbridled discretion in imposing the death penalty in violation of the Eighth Amendment. Death penalty statutes around the country, including Oklahoma, were struck down. In response, states revamped their death penalty statutes. In 1976, the Court, in a series of cases, reviewed the newly-enacted death penalty statutes. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). The Court upheld those death penalty statutes channeling the jury's discretion to determine which defendants were eligible for the death penalty and, yet, allowing the jury the freedom to take into consideration the unique characteristics of each defendant and crime. *Gregg, supra; Proffitt, supra; Jurek, supra.* The Court struck down those statutes imposing a mandatory death sentence for every person convicted of first degree murder. *Woodson, supra; Roberts, supra.*
*Cheney,* 1995 OK CR 72, ¶ 9, n. 7, 909 P.2d at 78, n. 7.

**23.** *See Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)(holding that execution of individuals who were under 18 years of age at time of their capital crimes is unconstitutional); *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)(holding it is unconstitutional to execute mentally retarded persons); and *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)(holding it is unconstitutional to impose the death penalty on a person who is insane).

counsel because trial counsel failed to object and preserve for appellate review the claims of error raised in his brief. He maintains that should this Court find any of the claims raised in his other propositions waived on account of trial counsel's failure to either contemporaneously object at trial or file a pre-trial motion, relief must be granted on the basis of ineffective assistance of counsel.

¶ 36 This Court reviews claims of ineffective assistance of counsel under the two-part *Strickland* test that requires an appellant to show: [1] that counsel's performance was constitutionally deficient; and [2] that counsel's performance prejudiced the defense, depriving the appellant of a fair trial with a reliable result. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Davis v. State,* 2005 OK CR 21, ¶ 7, 123 P.3d 243, 246. Under this test, Tremane must affirmatively prove prejudice resulting from his attorney's actions. *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067–68; *Head v. State,* 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. "To accomplish this, it is not enough to show the failure had some conceivable effect on the outcome of the proceeding." *Head,* 2006 OK CR 44, ¶ 23, 146 P.3d at 1148. Rather, Tremane must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 37 For the reasons discussed in this opinion rejecting Tremane's other claims, his ineffective assistance of counsel claim must likewise fail because he cannot show that the alleged errors affected the outcome of his case. This claim is denied.

### B.

¶ 38 In his sixth proposition, Tremane argues that he was denied his Sixth Amendment right to effective counsel because his trial attorney failed to fully investigate his background and present mitigating evidence at his capital sentencing proceeding. He also

claims his attorney's failure to impeach accomplice Brandy Warden constituted ineffective assistance as well. Pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2005), Tremane applied for an evidentiary hearing to supplement his ineffective assistance of counsel claim, appending to his application, *inter alia,* numerous records detailing his contacts with the Office of Juvenile Affairs and various affidavits from individuals involved in his case or in his life. This Court found that Tremane had met his burden to warrant a hearing on his ineffective assistance of trial counsel claim and remanded the matter to the district court for an evidentiary hearing.[24] The district court held an evidentiary hearing and submitted written findings of fact and conclusions of law concerning the availability of and use of the evidence that was presented in Tremane's application, the effect of any evidence not presented on the trial proceedings, whether the failure to use the evidence was trial strategy, and whether the evidence was cumulative or would have affected the verdict. The district court found that the evidence presented in the application was available to trial counsel and that trial counsel presented during Tremane's trial "substantially all of the credible evidence." The district court found no overall failure to investigate because "most" of the available mitigating evidence was admitted through the testimony of the defense expert during Tremane's capital sentencing proceeding. The district court concluded that any evidence omitted from the trial that was presented during the evidentiary hearing would have had little or no effect on the outcome of the trial proceedings.

¶ 39 In reviewing the district court's findings, we accord them "strong deference." Rule 3.11(B)(3)(b)(iv), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006). We must, however, decide the ultimate issue whether trial counsel was ineffective.

Ineffective assistance under *Strickland* is deficient performance by counsel resulting

---

24. "Order Remanding to the District Court of Oklahoma County for Evidentiary Hearing on

Claim of Ineffective Assistance of Counsel," Case No. D–2005–171 (Nov. 16, 2005).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

in prejudice, with performance being measured against an "objective standard of reasonableness," "under prevailing professional norms." This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation. In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to "counsel's perspective at the time" investigative decisions are made, and by giving a "heavy measure of deference to counsel's judgments[.]"

*Rompilla v. Beard,* 545 U.S. 374, 380–81, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005) (citations omitted).

▮▮▮▮ ¶ 40 The crux of Tremane's claim is that trial counsel failed to obtain his juvenile records from the Office of Juvenile Affairs and consequently failed to discover mitigation witnesses who could have testified about positive relationships they had with him during his life or corroborate positive or mitigating information about his background.

¶ 41 The district court concluded that trial counsel and the defense psychological expert had possession of Tremane's background records, including his relevant juvenile records. This finding is supported by the record. The psychological expert testified at trial that he had reviewed records from the Department of Human Services, patient records from Tremane's brief stay at Meadow Lake Mental Health Hospital, prison records and police records. He also referred to records from

"juvenile sources" and testified about Tremane's placement in therapeutic foster care. He indicated that he had reviewed records from Tremane's placement in the Vision Quest program [25] as well as Tremane's juvenile petitions to adjudicate him delinquent for various crimes. He testified that Tremane did well in his juvenile placements and, in fact, had his best year ever while living in therapeutic foster care. The defense psychologist was not called at the evidentiary hearing on ineffective assistance of counsel to further identify the records he had reviewed in preparation for the capital sentencing proceeding in this case.

▮▮▮▮▮ ¶ 42 Tremane's trial attorney testified at the evidentiary hearing that he believed he had the necessary records to put on his case in mitigation. He referred to Tremane's school records and his "growing up" records. Counsel recalled specifically having records from the Office of Juvenile Affairs, the Department of Human Services and Meadow Lake Mental Health Hospital.[26] Counsel testified that he gave the records he had to his expert and employed a mitigation strategy that had proved successful for him in the past. The strategy consisted of presenting a psychologist to testify about Tremane's background, family history and the expert risk assessment of Tremane's future dangerousness,[27] along with testimony from family witnesses.[28] Counsel testified that while he did not interview or speak with any of Tremane's foster family members or mentors that he was assigned while in juvenile custody, he did speak with everyone Tremane himself identified as a potential mitigation witness.[29]

---

25. Dr. Hand did testify that he did not have Tremane's records from his placement in the COJAC program.

26. The records custodian from the Office of Juvenile Affairs testified at the evidentiary hearing that there had not been a records request for Tremane prior to appellate counsel's request. There was, however, testimony that the Office of Juvenile Affairs was part of the Department of Human Services until approximately 1995 and that there was some records overlap. Trial counsel also had access to the background records in Zjaiton's case through the prosecutor's open file policy.

27. Counsel testified that he believed the expert was the key witness in presenting a mitigation case and that family witnesses were not as important.

28. Defense counsel presented Tremane's godmother as the defense's first witness followed by the psychologist and then Tremane's mother. Tremane told defense counsel not to put on any other family witnesses after his mother's testimony because he did not want to subject them to such an emotional experience.

29. At the evidentiary hearing, the defense called the jury foreperson at Tremane's trial to testify, consistent with her affidavit, that her verdict

¶ 43 The standard for counsel's performance is competence. The trial court on remand for evidentiary hearing found that counsel's representation did not fall below that standard. Counsel presented evidence concerning Tremane's troubled background and about his childhood growing up in an abusive (both physically and emotionally) household with little parental supervision or guidance. He presented evidence that Tremane filled the void created by the absence of his parents by following in the footsteps of his older unstable, delinquent brother, whose affection and approval he sought. He presented evidence that when Tremane was away from his brother's influence, he obeyed the rules set for him and did well. Trial counsel also presented evidence through the psychologist about the risk factors in Tremane's background and how those factors affect development and behavior. He presented evidence about the expert risk assessment of Tremane to contest the State's claim that Tremane constituted a continuing threat to society. And he presented evidence that Tremane was a loving parent and that his family cared for him and would maintain contact with him if he were given a sentence of imprisonment.[30]

¶ 44 Evidence of Tremane's chaotic home life and background was presented to the jury through both an expert and lay witness. While other witnesses not called at trial could have provided further detail to support the mitigation evidence that Tremane did well in his juvenile placements, grew up in an abusive home and was negatively influenced by his older brother, credible evidence was presented covering these areas. We find the trial court correctly concluded that the material testimony from those credible witnesses not called at trial was nonetheless presented to the jury. We further find that Tremane has failed to show that the outcome of his case would have been different had the credible evidence developed at the evidentiary hearing been presented during his capital sentencing proceeding.

¶ 45 Nor can Tremane show that trial counsel was ineffective in failing to impeach accomplice Brandy Warden. At trial, Brandy denied writing two letters containing statements that the writer did not believe that Tremane killed Wipf.[31] A handwriting expert testified at the evidentiary hearing that she had compared those letters with a known sample of Brandy's handwriting, and concluded that all three letters were written

likely would have been different had she heard the omitted testimony. Post trial, the juror was shown isolated affidavits by an investigator for appellate counsel which were presented out of the context of the State's evidence and without benefit of cross-examination and the jury process. The district court found that the testimony of the juror was of little value given the circumstances. This juror was an incompetent witness and her affidavit and testimony should have been disallowed under 12 O.S.2001, § 2606(B). It is a well settled rule that jurors may not impeach or contradict their verdict by affidavits or testimony after they have been discharged from the jury. *Wacoche v. State*, 1982 OK CR 55, ¶ 17, 644 P.2d 568, 572. The reasoning behind the rule is simple. Were individual jurors allowed to make affidavits or give testimony disclosing the manner of deliberations and their reasons for rendering a particular verdict, there would be no reasonable end to litigation. *See Matthews v. State*, 2002 OK CR 16, ¶ 14, 45 P.3d 907, 915. Jurors would be harassed by both sides and find themselves being repeatedly questioned about their decision. *See id.* Such an unsettled state of affairs would be a disservice to the parties and an unconscionable burden upon citizens who serve on juries. This rationale applies with equal weight when affidavits or testimony by former

jurors is offered in an attempt to show that evidence not presented by counsel might well have produced a different result because it requires jurors to reveal the mental processes undertaken in deliberations. Any other result would potentially subject jurors to a barrage of queries concerning how they would have voted if presented any one of an inestimable number of pieces of evidence. Since such testimony is inadmissible, we will not consider it in our consideration of this claim.

30. From the mitigation case presented by counsel, the district court identified for the jury seventeen mitigating circumstances, including that the defendant's parents were divorced when he was young, the defendant had no father figure during childhood and little support from his natural father, the defendant's mother was absent during most of his childhood and he was faced with substitute parenting, the defendant can live in a structured prison environment without hurting anyone, the defendant spent time in foster care, and the defendant took directions from his older brother Zjaiton. (O.R.634–35)

31. These letters were admitted at the evidentiary hearing as Defense Exhibit 9.

by the same person. Though Brandy denied writing the letters, she admitted at trial that she had made similar statements. For that reason, there is no basis to find that the outcome of Tremane's trial would have been different had counsel further impeached Brandy.

### 1. ACCUMULATION OF ERROR

¶ 46 In his seventh proposition, Tremane asks this Court to review the aggregate impact of errors that occurred during his trial. He claims the cumulative effect of the errors requires reversal or sentence modification. This Court has recognized that when there are "numerous irregularities during the course of [a] trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *DeRosa*, 2004 OK CR 19, ¶ 100, 89 P.3d at 1157 *quoting Lewis v. State*, 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176. We have reviewed Tremane's claims for relief and the record in this case and conclude that any errors or irregularities, even when considered in the aggregate, do not require relief. They did not render his trial fundamentally unfair, taint the jury's verdict, or render sentencing unreliable.

### VI. MANDATORY SENTENCE REVIEW

¶ 47 Title 21 O.S.2001, § 701.13 requires this Court to determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance. After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2001, § 701.13(E).

¶ 48 A review of the record in this case in conjunction with Tremane's claims for relief reveals that his conviction and death sentence were not the result of trial court error, improper evidence, or witness testimony. His death sentence was not imposed because of any arbitrary factor, passion, or prejudice. The jury's finding of three aggravating cir-

cumstances is factually substantiated. The Judgment and Sentence of the trial court is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, P.J.: Concurs in Results.

C. JOHNSON, V.P.J., CHAPEL, J. and LEWIS, J.: Concur.