**Turner Kemp MARTIN, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–75–378.**

Court of Criminal Appeals of Oklahoma.

March 11, 1976.

Rehearing Denied March 29, 1976.

E. Terril Corley, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge.

Appellant, Turner Kemp Martin, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–74–918, for the offense of Manslaughter, in violation of 21 O.S.1971, § 711. His punishment was fixed at a term of twenty-

five (25) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial D. A. Roberts testified that he was a homicide investigator for the Tulsa Police Department and that on April 18, 1974, he went to the emergency room of Hillcrest Hospital in Tulsa to investigate the death of the defendant's seven-week-old son, Turner Kemp Martin, Jr. Upon his arrival at the hospital Officer Roberts was told that the infant had already been pronounced dead by Dr. Mary Saddoris. He proceeded to advise the defendant that it would be necessary for him to come down to the Tulsa Police Department for questioning concerning the death of the child. Officer Roberts recalled observing the body of the dead child in the emergency room and noticed that there were several visible marks on the body including a deep red bruise on the infant's left cheek which appeared in a shape similar to a handprint. He identified State's Exhibits Nos. 1 through 10 as being photographs of the deceased infant which were taken in the emergency room of the hospital while he was present. These photographs were admitted into evidence. Officer Roberts further testified that he talked to the defendant at the Tulsa Police Department at about noon on April 18, 1974; that after advising him of his constitutional rights and obtaining his signature on a waiver form he inquired about the marks on the baby's face and earlier injuries to the child. He related that the defendant told him that he had taken his wife to work that morning leaving the child at home and that when he returned the child was gasping for air and that he struck it twice in the head region in an attempt to help it breathe, but when that did not seem to help he took the baby to Hillcrest Hospital. Defendant also stated to Roberts that he had struck and injured his child on one other occasion. He recalled that defendant had said the incident occurred on April 11th or 12th while he was working on his stereo. The stereo shocked him and in frustration he struck his crying baby. Immediately after that incident he became concerned about the child's condition and took him to St. Johns Hospital where doctors there determined that the baby had a broken rib. A police officer was summoned to the hospital to discuss with the defendant the circumstances surrounding that injury.

Dr. Leo Lowbeer testified that he was Chief Consulting Pathologist at Hillcrest Hospital Medical Center in Tulsa and that on April 18, 1974, he performed an autopsy on Turner Kemp Martin, Jr. The autopsy revealed that the infant was undernourished, anemic, and had rickets at the time of death. Dr. Lowbeer found fresh finger marks on the infant's left cheek in the form of parallel bruises. Bruises on the abdomen were also present. Internal injuries included four broken ribs, which were nearly healed, and a fresh subdural hemorrhage on the right side of the brain. Dr. Lowbeer stated that in his opinion, based on his autopsy findings, the infant's death resulted from the subdural hemorrhage which was caused by a blow to the left side of the head, resulting in a hemorrhage on the opposite side of the brain, a phenomenon known as contra coup.

On cross-examination Dr. Lowbeer repeatedly denied that his testimony concerning subdural hemorrhages was in conflict with the writings of recognized authorities on the subject. He admitted that a blow to the head was just one of many possible causes of a subdural hemorrhage. He also related that the infant was a very unhealthy child overall and it was his opinion that a normal child would not have died under the same circumstances. On redirect-examination Dr. Lowbeer repeated his conclusion that the infant's subdural hemorrhage was the cause of death, indicating that there was no doubt in his mind that the hemorrhage had resulted from a blow to the head.

Thereafter the State rested.

The defense opened with an attempt to present the testimony of two polygraph

examiners but the court refused to admit the testimony.

Sybil Martin, defendant's mother, and friends of the defendant, Ronna Mae Massey, Lorena Hickman, Paul Madlane, and William Morad, gave substantially similar testimony about the defendant's relationship with his infant son. All had been around the defendant during the life of the child and none had seen him mistreat the baby, although Mrs. Martin told of accompanying the defendant to St. Johns Hospital after he had slapped the child on April 11, and she also related one other incident in which the baby's bottom was bruised when the defendant had slapped him while trying to change his diapers. All had formed the same opinion, based on the individual observations, that the defendant was proud of his child and gave him proper care.

Sandra Martin testified she was the defendant's wife; that she was 18-years-old, and had been married to the defendant for a little over two years. She stated that Turner Kemp Martin, Jr., was born on February 24, 1974, and had been sick during the last month of his life. On cross-examination Sandra Martin testified that she had been pregnant at the time of her marriage to Turner Martin and that their first child was born on February 23, 1973, and had been immediately put up for adoption. She stated that her husband smoked marihuana and took LSD and that he had taken LSD on one occasion approximately five days prior to April 18, 1974.

Salvatore Russo testified that he was a licensed clinical psychologist and that on the basis of an interview with the defendant and the results of a battery of psychological tests it was this opinion that the defendant tended to be passive and had control over his emotions. He concluded that the defendant was of normal intelligence and could be categorized as non-assaultive.

The defendant testified in his own behalf and stated that he was 21-years-old and resided in Tulsa. He stated he had never been arrested for any crimes other than traffic offenses. He stated he had dropped out of high school midway through his senior year to marry Sandra Martin. At the time his son was born the defendant was employed as a utility worker for Sky-Chef. The defendant stated that he and his wife wanted the baby very much and shortly after the birth of his son he began to stay home to care for the baby while his wife worked. He recalled that on one occasion while attempting to change the baby's diapers he became worried that the baby's kicking might cause an accident and he struck the baby on the bottom, a bruise resulting from the blow. The defendant acknowledged that there was also a later incident in which he lost his temper and struck the baby on the abdomen with his open hand and as a result had to take the infant to the hospital. He recalled that on April 18, 1974, he took his wife to work, leaving the child propped up in a recliner so that he could not fall out. When he returned to the house the infant was struggling to breathe and he took the child out of the recliner and slapped him on the back to dislodge anything which might be caught in his throat. The child continued to gasp for breath and the defendant attempted mouth to mouth resuscitation. This procedure also failed and he panicked and slapped the child on the face. Immediately realizing that this action had made the problem worse, he rushed his son to Hillcrest Hospital emergency room where he was pronounced dead on arrival.

On cross-examination the defendant testified that he had been in shock immediately after the death of his son and was remorseful. He acknowledged that he had started taking drugs while in Kansas City in March of 1973, and he testified that he had taken psilocybin about five days prior to his infant son's death.

Thereafter the defense rested.

The defendant's first assignment of error is that the court committed reversible error by permitting the prosecutor to present evidence of other crimes. The de-

fendant contends that the court erred in failing to sustain objections to questions asked for the purpose of determining the defendant's involvement with drugs. The defendant further contends that evidence bearing on injuries inflicted by the defendant on his child prior to the day of the child's death should not have been admitted. The defendant in this case waived a jury trial and was tried before the court. In the eighth paragraph of the Syllabus to *Capshaw v. State,* 69 Okl.Cr. 440, 104 P.2d 282 (1940), we stated:

"In a case where a jury is waived and the cause tried to the court, the presumption is that the court in arriving at his decision and rendering judgment considered only that evidence which is competent and admissible and which has a material bearing on the issues of the case and disregarded incompetent evidence which was admitted."

See also, *Herren v. State,* 74 Okl.Cr. 432, 127 P.2d 384 (1942).

The defendant's second assignment of error is that the verdict was unsupported by the evidence. The defendant argues that the only evidence establishing a cause of death was the testimony of Dr. Leo Lowbeer, the physician who performed the autopsy on the infant, and that Dr. Lowbeer's credibility was thoroughly impeached on cross-examination. Therefore, the defendant contends that the State failed to prove beyond a reasonable doubt that Turner Kemp Martin, Jr., died as a result of a blow struck by the defendant. Clearly, it is the law in this State that medical experts may be allowed to testify to their opinions as to the cause and manner of the death of the deceased. See, *Miller v. State,* 9 Okl.Cr. 255, 131 P. 717 (1913). Thus, the impeachment of Dr. Lowbeer's credibility during cross-examination went only to the weight to be given to his testimony and not to its admissibility. It is our opinion that the State presented sufficient competent evidence from which the court could reasonably conclude that the defendant delivered the blow which

was the cause of his son's death. Where a jury is waived and the case is tried before the court, the weight and credibility of the evidence as determined by the court is the same as if determined by the jury and will be given the same force and effect. *State v. Schave,* 72 Okl.Cr. 75, 113 P.2d 203 (1941).

The defendant's third assignment of error is that the court erred in refusing to allow the testimony of two polygraph operators concerning polygraph tests which they had administered to the defendant. This Court has repeatedly held that results of lie detector tests are not admissible. See, *Henderson v. State,* 94 Okl.Cr. 45, 230 P.2d 495 (1951); *Leeks v. State,* 95 Okl.Cr. 326, 245 P.2d 764 (1952); and *Vetter v. State,* Okl.Cr., 506 P.2d 1400 (1973).

The defendant's fourth assignment of error is that the court erred in finding the defendant guilty of manslaughter in the first degree. We have heretofore detailed the evidence submitted to the judge for his consideration and are of the opinion that the evidence amply supports his verdict. It has long been the law of this State that a judgment of the court, trying a criminal case without a jury, reasonably supported by the evidence will not be disturbed. See, *Bullington v. State,* 38 Okl. Cr. 214, 259 P. 876 (1927); *Adams v. State,* Okl.Cr., 484 P.2d 1329 (1971); and *Jenkins v. State,* Okl.Cr., 501 P.2d 905 (1972).

The defendant's fifth assignment of error is that the accumulation of errors and irregularities in the trial when considered as a whole deprived the defendant of a fair trial. In *Haney v. State,* Okl.Cr., 503 P.2d 909 (1972), this Court held that if the previous assignments of error are without merit it follows that the assignment of error which asks that the previous assignments of error be considered collectively would also be without merit. *Wright v. State,* Okl.Cr., 531 P.2d 696 (1975), and *Glover v. State,* Okl.Cr., 524 P.2d 51 (1974).

The defendant's final assignment of error is that the sentence is excessive.

**400**

This Court will not modify a sentence unless, under all the facts and circumstances, we can say that the sentence is so excessive as to shock the conscience of this Court. *Roberts v. State,* Okl.Cr., 473 P.2d 264 (1970). In *Wardingley v. State,* Okl.Cr., 512 P.2d 1396 (1973), this Court in reviewing a forty-five year sentence following a conviction of first degree manslaughter stated:

"From the foregoing statement of facts we cannot [conscientiously] say that the sentence imposed shocks the conscience of this Court. To the contrary, we are of the opinion that one who affects the death of a helpless infant should be severely punished. . . ."

The twenty-five year sentence imposed in the instant case does not shock the conscience of this Court in light of the particular facts and circumstances of the case.

For all of the above and foregoing reasons, the judgment and sentence appealed from is, accordingly, *AFFIRMED*.

BRETT, P. J., and BUSSEY, J., concur.