2009 OK CR 16

**David Brian MAGNAN, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2005–683.**

Court of Criminal Appeals of Oklahoma.

April 22, 2009.

---

Silas R. Lyman II, Diane Box, Norman, OK, attorneys for defendant at plea hearing and sentencing.

Paul Smith, Assistant District Attorney, Seminole County, Wewoka, OK, attorney for State at plea hearing and sentencing.

Sandra Mulhair Cinnamon, Jamie D. Pybas, Norman, OK, John Echols, Sapulpa, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

A. JOHNSON, Vice Presiding Judge.

¶ 1 David Brian Magnan pled guilty to three counts of First Degree Murder in violation of 21 O.S.2001, § 701.7 and one count of Shooting With Intent to Kill in violation of 21 O.S.2001, § 652 in the District Court of Seminole County, Case No. CF–04–59. Before accepting the pleas, the Honorable George Butner received the results of a psychological competency evaluation and conducted an in-court competency inquiry in which he found Magnan competent to enter the pleas. At his sentencing hearing, Magnan stipulated to the aggravating circumstances pled in the State's bill of particulars, stated he had nothing to present in mitigation, waived any direct appeal, and asked to be sentenced to death for the murders. The district court judge sentenced Magnan to death on each of the murder counts and sentenced him to a term of life imprisonment on the shooting-with-intent-to-kill count.

¶ 2 Because Magnan waived his right to a direct appeal, our review here is limited to two non-waivable issues. We consider whether this crime occurred in Indian Country and so is beyond the jurisdiction of the State of Oklahoma and we conduct our statutorily required sentence review under 21 O.S. 2001, § 701.13 and Rule 9.4, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22 Ch.18, App. (2009). The sentence review is mandatory for all death-penalty cases and is not subject to waiver. *Fluke v. State,* 2000 OK CR 19, ¶ 4, 14 P.3d 565, 567.

### FACTS

¶ 3 On the evening of March 2, 2004, a group of family and friends, James Howard, Lucilla McGirt, Karen Wolf, Amy Harrison, and Eric Coley, gathered at Mr. Howard's rural Seminole County home to celebrate Mr. Coley's birthday. Ms. Harrison was Ms. Wolf's daughter and Mr. Howard's niece. At some point, Mr. Howard answered a telephone call from Aaron Wolf, a co-defendant in this case. As the two men argued, Ms. Harrison took the telephone in time to hear Aaron Wolf say "I am going to kill that m—— f——."

¶ 4 Later that evening, at approximately 1:00 a.m. on the morning of March 3rd, Magnan, Aaron Wolf, and Redmond Wolf, Jr., arrived at Mr. Howard's home in Magnan's car. Mr. Coley and Ms. Harrison went out of the house to meet them. As Harrison approached, Aaron Wolf told her to get out of there and gestured toward the woods behind the house. She fled. Coley tried to stop Magnan from going inside the house. During the resulting scuffle, Coley pushed Magnan to the ground. We learn what happened next from Coley's viewpoint. He saw what appeared to be a shiny gun barrel in Magnan's hand. A flash of flame erupted from the object and Coley realized he had been shot in his left side. In spite of his injury, he ran to the house and banged on windows trying to warn Howard, McGirt, and Wolf.

¶ 5 After a short while, Harrison left the hiding place she had found in the woods and gingerly moved toward the house. As she approached, she heard gunshots from inside. She heard men get into the car and drive away. Harrison found Coley outside, preparing to enter the house. Inside, Coley saw Howard bloody and lying on a bed near the kitchen. In the bedroom he found McGirt and Wolf. Both women had been shot. After returning to the kitchen and warning Harrison against going in the bedroom where her mother was, he collapsed from his injuries.

¶ 6 Despite Coley's admonition, Harrison went to check on her mother and McGirt. She found her mother and McGirt on the bed. Harrison knew her mother was dead, but saw that McGirt was still alive. She went back to the kitchen to check on Howard and found him covered in blood and apparently dead.

¶ 7 During his plea colloquy, Magnan told the district court judge that he shot Eric Coley with the intent to kill him. He said he then walked into the house where he saw James Howard lying in a bed near the kitchen. When the old man looked up at him, Magnan said "goodbye" and shot him, intending to kill him. Magnan told the court he went into the bedroom intending only to say "good-bye" to Karen Wolf, but when she "got smart" with him, he shot her, intending

to kill her. Magnan admitted he next shot McGirt, who was in the bed next to Wolf, and intended to kill her as well.

¶ 8 James Howard and Karen Wolf died at the scene. Lucilla McGirt was hospitalized for approximately two weeks before she died of complications from her gunshot wounds. Eric Coley survived his gunshot injury.

## DISCUSSION

### I. Jurisdictional Issue

¶ 9 Magnan's attorneys contend that the crime scene is in Indian Country and therefore beyond the State's jurisdiction. This issue was not raised in the district court. Normally, an issue not raised in the trial court, and not related to our mandatory death-penalty sentence review, is waived when a defendant pleads guilty, waives appeal, and we proceed solely under 21 O.S. 2001, § 701.13. *Duty v. State*, 2004 OK CR 20, ¶ 20, 89 P.3d 1158, 1162. A guilty plea, however, waives only nonjurisdictional defects. *Frederick v. State*, 1991 OK CR 56, ¶ 5, 811 P.2d 601, 603. It does not waive a claim that a court lacks the power to adjudicate a charge against the defendant. *See e.g., Forester v. State*, 1927 OK CR 33, 252 P. 861, 864 (recognizing that party can never waive or consent to subject matter jurisdiction where there is no basis for court to exercise jurisdiction); *Armstrong v. State*, 1926 OK CR 259, 248 P. 877, 878 (holding that jurisdiction of the subject matter cannot be conferred by consent, nor can it be waived, and it may be raised at any time before or after trial, and even for the first time on appeal).

¶ 10 Recognizing that Magnan's attorneys were raising a jurisdictional issue, inadequately supported by the record below, we granted Magnan's attorneys' request for a remand to the district court for an evidentiary hearing.

¶ 11 The district court heard evidence on Magnan's Indian status, the Indian status of the victims, the precise location of the property on which the murders occurred, and the title status of that property. The district court concluded on remand that the property was not Indian Country and the State properly exercised jurisdiction over the crimes

charged. The record on appeal has now been supplemented with the full record of that proceeding as well as the district court's findings of fact and conclusions of law. The parties have filed post-hearing supplemental briefs. The record is now complete and the issues fully briefed and argued.

¶ 12 Magnan's attorneys contend that the property on which the murders were committed is Indian allotment land and therefore subject only to federal jurisdiction as having occurred in Indian Country. *See e.g., Cravatt v. State*, 1992 OK CR 6, ¶ 7, 825 P.2d 277, 280 (holding that jurisdiction over major crimes in Indian Country is exclusively federal). Under federal law, "Indian Country" is defined as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, whether within or without the limits of a state, and (c) *all Indian **allotments**, the Indian titles to which have not been extinguished*, including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added). "Allotment" is a term of art in Indian law describing land owned by individual Indians that is either held in trust by the United States or is subject to statutory restrictions on alienation. *Ahboah v. Housing Authority of the Kiowa Tribe of Indians*, 1983 OK 20, ¶ 10, 660 P.2d 625, 627; *United States v. Stands*, 105 F.3d 1565, 1571–72 (8th Cir.1997)(citing Felix S. Cohen's *Handbook of Federal Indian Law* 615–16 (Rennard Strickland et al. eds.1982)). Allotted Indian property that is burdened by restrictions against alienation constitutes Indian Country. *United States v. Ramsey*, 271 U.S. 467, 470–72, 46 S.Ct. 559, 560, 70 L.Ed. 1039 (1926); *Ahboah*, 1983 OK 20, ¶ 10, 660 P.2d at 627; *United States v. Sands*, 968 F.2d 1058, 1062 (10th Cir.1992).

¶ 13 The record shows that the murders in this case occurred in a house located on

property that was part of the original restricted allotment of Jimpsey Tiger, a full-blooded Seminole. On Jimpsey Tiger's death in 1944, the property passed in 1/5th fractional interests to his second wife Lena Tiger, 13/16th Creek–Seminole, and four sons and daughters including daughter Kizzie Tiger, a 3/4th blood Seminole. Lena Tiger sold her 1/5th interest in the surface rights to the property to her son George William Tiger, a 3/4th blood Seminole, but expressly retained the mineral rights. In 1950, George William Tiger and his two other siblings sold their interests in the surface rights to their sister Kizzie Tiger. Thus, as of 1950, Kizzie Tiger owned all of the surface rights (1/5th acquired by inheritance and 4/5th by conveyance from her siblings) and 1/5th of the mineral rights (acquired by inheritance). In 1970, Kizzie Tiger, now Kizzie Tiger Wolf, executed a deed purporting to convey the surface rights to the property to the Seminole Nation Housing Authority but expressly reserving the mineral interests. In 1981, the Seminole Nation Housing authority conveyed the property back to Kizzie Tiger Wolf. Kizzie Tiger Wolf died in 1991. Her full interest in the surface rights and her 1/5th interest in the mineral rights were divided among her husband and their nine children. At the time of the murders, these interests remained in the possession of these heirs and their successors.

¶ 14 Magnan contends that the crime scene property is Indian Country because 4/5ths of the surface interests in the property remain restricted against alienation as Indian land. According to Magnan, Kizzie Tiger Wolf's 1970 conveyance of the surface rights to the property did not have the consent of the Secretary of the Interior and therefore the 4/5ths interest she acquired by purchase from her siblings and then conveyed to the Seminole Nation Housing Authority remained as restricted allotted Indian land. The State contends on the other hand that all Indian right and title to the property were extinguished in a 1970 proceeding in Seminole County District Court, a proceeding in which the court approved the conveyance of the surface rights to the property. According to the State, the county district court's approval of the conveyance satisfied federal

law sufficiently to lift the Indian lands restrictions on the property. Thus, the first potentially dispositive question of whether the crimes in this case occurred in Indian Country turns on whether Kizzie Tiger's 1970 conveyance of the surface rights in the property to the Housing Authority of the Seminole Nation extinguished all restrictions on alienation on the surface rights to the property.

¶ 15 Two acts of Congress are key to resolving this question. The first is the Act of Congress of July 2, 1945, 59 Stat. 313, 313–314 (1945), which states in relevant part that:

> No conveyance made by an Indian of the Five Civilized tribes ... for the use and benefit of such Indian with funds derived from the sale of, or as income from, restricted allotted lands and conveyed to him by deed containing restrictions on alienation without the consent and approval of the Secretary of the Interior prior to April 26, 1931, shall be invalid because such conveyance was made without the consent and approval of the Secretary of the Interior: *Provided,* That all such conveyances made after the date of the enactment of this Act must have the approval of the Secretary of the Interior.

(emphasis in original). The second is the Act of Congress of 1947, 61 Stat. 731 (1947), providing that:

> no conveyance ... of any interest in land acquired ... by an Indian heir or devisee of one-half or more Indian blood, when such interest was restricted in the hands of the person from whom such Indian heir or devisee acquired same, shall be valid unless approved in open court by the county court of the county in Oklahoma in which the land is situated.

¶ 16 When read together, these two Acts appear to require that for the 1970 deed to have removed restrictions on the property, two conditions must have been met. First, the 1945 Act seems to require that the Secretary of the Interior have consented to the conveyance of that portion of the surface property Kizzie Tiger Wolf had acquired by inheritance (1/5th interest) from her father. Second, the 1947 Act seems to require that

the conveyance must have been approved in open court by the Oklahoma state court of the county in which the property was located for that portion of the property Kizzie Tiger had acquired by conveyance from her siblings. It might be argued that the 1947 Act superseded the 1945 Act by replacing the Secretary of the Interior approval requirement with a requirement for Oklahoma county court approval of conveyance of a restricted property, but under the circumstances of this case, it is not necessary to reach this question. The record of the 1970 Seminole County District Court proceeding in which Kizzie Tiger Wolf sought approval of the conveyance of the surface rights from her and her husband to the Seminole County Housing Authority shows that the requirements of both Acts were met during the course of the proceeding.

¶ 17 The record shows that in 1970, Kizzie Tiger Wolf and her husband petitioned the Seminole County District Court for removal of restrictions and approval of the deed purporting to convey their entire interest in the surface rights in the property to the Seminole Nation Housing Authority. Notice of that proceeding was served on the Area Director of the Bureau of Indian Affairs and the United States Department of the Interior: Dean Storts, "Trial Attorney, United States Department of the Interior" acknowledged receipt on behalf of the Department of the Interior. Kizzie Tiger Wolf appeared at the hearing with her attorney, James Groves, and offered testimony. Mr. Storts appeared at the hearing for the Department of the Interior and entered no objection to the conveyance.

¶ 18 The 1970 order approving the conveyance recited that the District Court of Seminole County found that Kizzie Tiger Wolf and her husband were offered adequate compensation for the conveyance and were not subject to any fraud, overreaching, or other illegality in making it. Additionally, the district court found that "M. Dean Storts, United States Trial Attorney, has joined with said Petitioners and requested the Court to approve said deed without submitting the same at public auction and has agreed that said

conveyance would be in the best interest of the petitioner."

¶ 19 In the evidentiary hearing held on our remand in this case, the district court concluded that the 1970 conveyance removed all restrictions on the surface estate. It did so by reasoning that the 1970 deed purported to convey *all* of Kizzie Tiger Wolf's surface rights to the Seminole Nation Housing Authority (including her 4/5ths interest requiring Secretary of the Interior approval under the 1945 Act), and that the participation of the Department of the Interior's attorney in that proceeding, a proceeding in which he requested that the deed be approved by the Seminole County District Court, constituted the requisite approval of the Secretary of the Interior necessary for the lifting of restrictions on the 4/5ths surface interests Kizzie Tiger Wolf obtained by purchase from her siblings. With regard to Kizzie Tiger Wolf's 1/5th inherited interest, the district court seemed to conclude that no Secretarial approval was required under the 1945 Act, but that state court approval was required under the 1947 Act, and that approval was granted, as permitted by the Act, with entry of the Seminole County District Court's Order approving the conveyance.

¶ 20 It is clear from this record, that regardless of whether the 1970 proceeding in Seminole County District Court was intended to do so or not, it was in effect a combined proceeding that satisfied the requirements of both the 1945 and 1947 Acts (i.e., the 1945 Act requiring secretarial approval for conveyance of property acquired by deed, and the 1947 Act requiring Oklahoma State court approval for property acquired by inheritance). We agree with the district court's conclusion, therefore, that the 1970 conveyance extinguished all Indian lands restrictions that attached to surface estate of the property.

¶ 21 Anticipating this result, Magnan argues that even if Indian land restrictions to the surface were removed in their entirety by the 1970 conveyance, 4/5ths of the mineral interests remain restricted and by virtue of that remaining restricted fractional interest, the entire property (surface and mineral) retained its character as Indian allotment

land. The 4/5ths figure Magnan relies on appears to be based on a title opinion contained in the supplemented record, an opinion which the district court found to be "a correct statement of the ownership interests of the title to this property." While we defer to the district court's finding that the title opinion correctly describes the allocation of ownership interests in the property, we assume only for the sake of argument the legal conclusion that the 4/5ths mineral interest remained restricted as Indian allotment property.[1] Assuming, therefore, that 4/5ths of the mineral interests in the property remained restricted, we are confronted with the second potentially dispositive jurisdictional question in this case: i.e., whether a fractional interest in the mineral estate that is subject to restrictions on alienation as Indian allotment property may burden the unrestricted surface estate in such a way to cause the surface estate to be categorized as Indian Country.

¶ 22 This Court considered a similar question in *Murphy v. State*, 2005 OK CR 25, 124 P.3d 1198. In *Murphy*, a murder occurred on a state road that at one time had been Indian allotted land. Over time, the surface estate on which the road was located, and 11/12ths of the mineral estate, had been conveyed to non-Indians. Applying a contacts and interests analysis analogous to the familiar "minimum contacts" test set out in *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the *Murphy* court concluded that the Oklahoma's contacts and interests in the surface property overwhelmed any fractional interest the Indian heir of the original allottee owned in the unseen mineral estate. According to *Murphy*, that conclusion was necessary because allowing an unobservable fractional interest to control the enforcement of laws on the surface of a property would lead to a checkerboard of alternating jurisdictions that would seriously burden the administration of state and local governments. *Murphy*, ¶¶ 42–43, 1206. *Murphy* held, therefore, that a fractional interest in an unobservable mineral interest is a contact with the surface estate that is insufficient to deprive the State of Oklahoma of criminal jurisdiction. *Id.* ¶ 42, 1206.

¶ 23 In this instance, although the restricted fractional interest is larger (4/5ths vs. 1/12th), under *Murphy's* contacts and interests rationale even a 4/5ths fractional interest in the mineral estate is insufficient to deprive the State of criminal jurisdiction over the surface of the property at issue here. This result stems in large part from the unique circumstances of this particular property. Specifically, evidence introduced at the evidentiary hearing shows that another homicide had previously occurred on the property in 1998. In that case, *United States v. Woods*, No. CR–98–26–B (E.D.Okla.), federal authorities prosecuted the case as having occurred in Indian Country.[2] Unlike Magnan, however, the defendant in *Woods* argued in federal district court that the property was ***not*** Indian Country. The federal district court agreed and dismissed the case for lack of jurisdiction. Key to the federal court's determination that the property was not Indian Country was its finding that Indian land restrictions on the property had been extinguished by Kizzie Tiger Wolf's 1970 conveyance of the surface rights to a non-Indian (i.e., the Seminole Nation Housing Authority).

¶ 24 In the *Woods* case, the federal district court found that the Secretary of the Interior

---

1. On the record before us, it is not clear how the title expert arrived at this figure and we are not necessarily convinced that it is correct based on the chain of title evidence contained in the record. In any event, Magnan's attorneys appear to concede that Kizzie Tiger Wolf's 1/5th inherited interest in the mineral estate was exempt from Indian land restrictions, and as stated in the main text, we need not resolve this issue, because the quantum of the fractional interest is not dispositive in this case.

2. At the evidentiary hearing held on our remand, the district court admitted as evidence the record of certain portions of the proceedings of the United States District Court of the Eastern District of Oklahoma in the case of *United States v. Woods*, No. CR–98–26–B. The transcript of the federal court's jurisdictional hearings and its minute order dismissing the case for lack of jurisdiction are therefore before us as part of the record on appeal. We rely on those documents for our understanding of the federal district court's jurisdictional finding with regard to this property.

approved the lifting of restrictions on the property through the participation of the Department of the Interior's attorney in the 1970 Seminole County District Court proceeding where the Department's attorney not only failed to lodge any objection to the conveyance, but urged the court to approve it. Thus, with the ruling of the federal district court in *Woods* that the property at issue here was not Indian Country, the United States ceded criminal jurisdiction over the property. Because the United States District Court for the Eastern District of Oklahoma found this same property not to be Indian Country for federal criminal jurisdictional purposes, unless we likewise find the property to be non-Indian Country, no sovereign entity will exercise criminal jurisdiction over the property, thereby creating a jurisdictional void.

¶ 25 If Oklahoma has a sufficient interest to exert criminal jurisdiction over the surface of a property restricted by an unobserved fractional mineral interest in order to avoid creation of a checkerboard jurisdiction, it must have an even more compelling interest in avoiding the creation of a jurisdictional void within its contiguous territory. Therefore, as in *Murphy*, but to an even greater degree here, the State's interest in exercising criminal jurisdiction over this property must overwhelm any fractional interest any Indian heirs of the original allottee may own in the unseen mineral estate. We agree, therefore, with the district court's conclusion that the crimes committed in this case did not occur in Indian Country and we likewise conclude that criminal jurisdiction was proper. Having resolved this threshold jurisdictional issue, we now turn to our statutorily mandated review of Magnan's sentence.

## II. Sentence Review

■■■■ ¶ 26 Except for jurisdictional issues, our sentence review is limited in scope to just two inquiries: (1) whether the evidence supports the aggravating circumstances found by the trial court judge; and (2) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. *Fluke*, 2000 OK CR 19, ¶ 4, 14 P.3d at 567; 21 O.S.2001, § 701.13(C). To determine whether the evidence supports the aggravating circumstances found by the district court or whether the sentence of death was imposed under some improper arbitrary influence, we review the record to include in-court testimony of witnesses, the court-ordered presentence investigation,[3] and any other evidence presented at the defendant's sentencing hearing.

### A. Factual Basis for Pleas

■■■■ ¶ 27 Magnan's attorneys contend initially that the district court abused its discretion by accepting Magnan's guilty pleas because, according to counsel, there was an insufficient factual basis for the pleas. Since this claim is neither jurisdictional nor related to our mandatory sentence review, it is waived. *Duty*, 2004 OK CR 20, ¶ 20, 89 P.3d at 1162.

### B. Aggravating Circumstances

¶ 28 At his sentencing hearing, against advice of counsel, and after being further cautioned by the judge, Magnan waived his right to present evidence of mitigating circumstances and expressly stipulated to each of the alleged aggravating circumstances just as he had done at his plea hearing. The district court then imposed the sentence of death by finding the existence of the following aggravating circumstances in connection with the murders of Karen Wolf and James Howard: (1) Magnan was previously convicted of a felony involving the use or threat of violence; (2) the existence of a probability that Mag-

---

**3.** This Court is normally prohibited from considering the contents of a presentence investigation report by 22 O.S.Supp.2002, § 982(D), which explicitly directs that "[t]he presentence investigation reports specified in this section shall not be referred to, or be considered in any appeal proceedings." Section 982(A), however, specifies that a presentence investigation report must be completed for all violent felonies, but expressly excludes offenses in which the death penalty is available as a possible punishment. Because the offenses at issue here are death penalty crimes, and because § 982 does not specify that a report must be prepared for these types of crimes, § 982's prohibition against considering "reports specified in this section" does not apply and we may consider the presentence investigation report in our analysis.

nan would commit criminal acts of violence and thereby constitute a continuing threat to society; (3) Magnan knowingly created a great risk of death to more than one person; and (4) the murders were committed while Magnan was serving a sentence of imprisonment for a felony conviction. *See* 21 O.S. 2001, § 701.12(1), (2), (6), and (7). Although the State alleged that the murders of Wolf and Howard were especially heinous, atrocious or cruel, the district court struck the aggravator with regard to Wolf and Howard. *See* 21 O.S.2001, § 701.12(4). With regard to Lucilla McGirt, however, the district court found the existence of all five aggravating circumstances, including the heinous, atrocious or cruel aggravator.

¶ 29 In accordance with our sentence review mandate we review all the aggravating circumstances found by the district court, challenged or unchallenged, to determine if each was sufficiently supported by the evidence. We review the sufficiency of the evidence for an aggravating circumstance in the light most favorable to the State to determine whether any rational trier of fact could have found the circumstance beyond a reasonable doubt. *DeRosa v. State*, 2004 OK CR 19, ¶ 85, 89 P.3d 1124, 1153.

### 1. *Prior Violent Felony Conviction*

¶ 30 Magnan admitted to the district court in his plea colloquy and stipulated in his sentencing hearing that he had been convicted in 2000 in federal court in Montana for the crime of arson with intent to injure. Additionally, the uncontested judgment and sentence document from that proceeding was before the court in the record of the preliminary hearing. This evidence is sufficient to support the trial court's finding that Magnan had been convicted previously of a violent felony.

### 2. *Continuing Threat*

¶ 31 Magnan's attorneys assert that the evidence was insufficient to support the aggravating circumstance of continuing threat to society. A finding of continuing threat requires evidence showing the defendant's conduct demonstrates both a threat to society and a probability the threat would continue to exist into the future. *Duty*, 2004 OK CR 20, ¶ 11, 89 P.3d at 1161(citing *Turrentine v. State*, 1998 OK CR 33, ¶ 77, 965 P.2d 955, 977). Support for this aggravating circumstance may consist of evidence of prior unadjudicated crimes, prior convictions, the circumstances of the crime for which a defendant is being sentenced, and the defendant's calloused nature. *Warner v. State*, 2006 OK CR 40, ¶ 126, 144 P.3d 838, 879; *Paxton v. State*, 1993 OK CR 59, ¶¶ 34–41, 867 P.2d 1309, 1322–23. A finding that a defendant may commit criminal acts of violence constituting a continuing threat to society is appropriate when the evidence establishes the defendant participated in other unrelated criminal acts and the nature of the crime exhibited the calloused nature of the defendant. *Warner*, 2006 OK CR 40, ¶ 126, 144 P.3d at 879. To prove this aggravating circumstance, the State may present any relevant evidence, in compliance with the rules of evidence, including evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses, or any other relevant evidence. *Id.*

¶ 32 Magnan's criminal history, which included a prior conviction for burning down a house with a former girlfriend in it, as well as a conviction for simple assault, were in evidence before the trial court. Additionally, the presentence investigation report, which the judge also considered, disclosed a history of misdemeanor arrests for domestic abuse, disorderly conduct, and driving under the influence of alcohol. Furthermore, evidence of the circumstances of the instant murders and Magnan's own admissions concerning those circumstances were also before the court.

¶ 33 Magnan's admissions and the circumstances of the murders are especially relevant to this aggravator because they show that Magnan committed the murders in a callous manner. This Court has upheld the existence of this aggravating circumstance numerous times based solely upon the evidence of the calloused nature of the crime itself. *See e.g., Pennington v. State*, 1995 OK CR 79, ¶ 70, 913 P.2d 1356, 1371 (listing cases).

¶ 34 In the present case, Magnan told the judge that he killed the elderly James Howard as he was lying in his bed, but did so only after he "looked up at him." Magnan admitted that he killed Karen Wolf with the words "[p]iss on you" and did so only because she "got smart" with him. Magnan stated that he decided to shoot Lucilla McGirt, who was lying in the same bed next to Karen Wolf, only after she spoke to him and he said "good-bye." Magnan's description of the cavalier manner in which he formulated the intent to kill his victims and the trivial reasons he proffered for killing them are clear evidence that he had little appreciation of the gravity of taking their lives. This evidence in itself is sufficient to support an inference of continuing threat aggravator. *See e.g., Snow v. State,* 1994 OK CR 39, ¶ 30, 876 P.2d 291, 298 ("[t]he defendant's attitude is critical to the determination of whether this defendant poses a continuing threat to society [because a] defendant who does not appreciate the gravity of taking another's life is more likely to do so again").

¶ 35 Nevertheless, Magnan's colloquy with the judge at his plea hearing provided further evidence that he posed a continuing threat to society, even within a prison environment, when he engaged the trial court judge in the following exchange:

Q. What if this Court gives you three consecutive life sentences?

A. I'll appeal it for not getting the right sentence or something.

Q. It's my understanding—

A. In other words, if I have anything to do with that to[o] much longer I am going to start hurting. There is no more talking about it. I have held my temper long enough at this time and that is it. I don't talk around corners or anything. I say things straight up.

(Plea Hrg. Tr. 14–15).

On cross-examination, the prosecutor sought clarification on this point as follows:

MR. SMITH: You [Magnan] indicated earlier in your plea of guilty regarding what you might do in the future. That gets you away if you were not able to get away from people you were going to start hurting

people. Would you agree that attitude kind of supports what we alleged in the Bill of Particulars there exist a probability that you would commit criminal acts of violence that would constitute a continuing threat to society?

A. That is true.

MR. SMITH: You are certain of that, is that correct?

A. Yes.

(Plea Hrg. Tr. 40).

¶ 36 Magnan's prior violent history coupled with his in-court statements about the circumstances of the instant crimes as well as his potential for future violence if incarcerated all provided the district court judge with sufficient evidence to conclude beyond a reasonable doubt that Magnan presented a continuing threat to society.

¶ 37 In addition to challenging this aggravator for insufficient evidence, Magnan's attorneys also argue that the continuing threat aggravating circumstance is unconstitutional. We have consistently rejected this claim and find nothing in the circumstances of this case or counsel's argument to cause us to reconsider those previous decisions here. *See e.g., Wood v. State,* 2007 OK CR 17, ¶ 19, 158 P.3d 467, 475; *Myers v. State,* 2006 OK CR 12, ¶ 87, 133 P.3d 312, 333–34; *Garrison v. State,* 2004 OK CR 35, ¶¶ 106–07, 103 P.3d 590, 609; *Lockett v. State,* 2002 OK CR 30, ¶ 41, 53 P.3d 418, 430–31 (collecting pre–2002 cases).

3. *Great Risk of Death to More Than One Person*

¶ 38 Magnan's attorneys contend the evidence was insufficient for the trial court to find beyond a reasonable doubt that Magnan knowingly created a great risk of death to more than one person because, according to Magnan's attorneys, the only evidence before the court of risk of death to more than one person was the undisputed fact that three persons died. In *Valdez v. State,* 1995 OK CR 18, ¶ 69, 900 P.2d 363, 383, this Court held that "[i]t is not the death of more than one person which supports [the aggravator], but the defendant's acts that create the risk of death to another which are in close proximity, in terms of time, location and intent to

the act of killing itself." Here, it was not the mere fact that three deaths resulted from Magnan's acts that supported the risk-of-death aggravator. Rather, it was the fact of Magnan's sequential killing of his victims and the sequentially formed intent to kill, that placed each successive victim at risk as Magnan discharged the handgun in or near the small house.

¶ 39 In his plea colloquy with the district court judge, Magnan was very specific. He insisted he did not form the intent to shoot and kill each of his three victims until he confronted each victim individually face-to-face. Therefore, when he shot and killed James Howard in the kitchen area, he placed Karen Wolf and Lucilla McGirt, his as-yet unintended victims in the bedroom, at great risk of death by recklessly discharging a firearm inside the small house in close proximity to the bedroom. Likewise, when he fired two shots into Karen Wolf with Lucilla McGirt lying next to her in the bed, he recklessly placed his as-yet unintended victim Lucilla McGirt at great risk of death. Moreover, the shooting of Eric Coley near the front entrance to the house, a shooting committed in the midst of an altercation with Coley in an effort to obtain access to the house where the murders were ultimately committed, certainly placed Coley's life at risk as well as placing the lives of bystanders Amy Harrison, Aaron Wolf, and Redmond Wolf, Jr. at risk. In total, this evidence was more than sufficient for the trial court to find beyond a reasonable doubt that Magnan knowingly created a great risk of death to more than one person during the commission of each of the three separate murders.

### 4. Heinous, Atrocious, Cruel

¶ 40 Magnan's attorneys argue that the evidence was insufficient to show beyond a reasonable doubt that Lucilla McGirt's murder was especially heinous, atrocious or cruel. To prove that a murder is especially heinous, atrocious or cruel, the evidence must show that the victim's death was preceded by torture or serious physical abuse. *Hogan v. State*, 2006 OK CR 19, ¶ 66, 139 P.3d 907, 931. Serious physical abuse is proved by showing that the victim endured conscious physical suffering before dying. *Id.*

¶ 41 Here, Magnan told the district court that Karen Wolf and Lucilla McGirt were in the same bed, that he shot Wolf when she "got smart" with him, and that he shot McGirt when she got up from the bed and spoke to him. At the preliminary hearing, the emergency medical technician who treated McGirt at the scene said McGirt was conscious and talking but had suffered gunshot wounds. The medical examiner's report noted a gunshot wound to the back of McGirt's head and a gunshot wound to her right shoulder. The medical examiner determined the cause of death as "complications of gunshot wounds, most likely that of pulmonary failure with pneumonia." The medical examiner's report listed some of McGirt's injuries as "[m]assive subpleural hematoma of the right lung with embedded bony tissue" and "massive tissue necrosis with nearly complete transection" of the thoracic spinal cord. In other words, the medical examiner's report indicated that McGirt's gunshot injuries included a bone-perforated lung and a severed spinal cord. The medical examiner's report noted further that McGirt died in the hospital approximately two weeks after being shot. McGirt's sister and daughter both testified that they visited McGirt in the hospital and she was conscious and obviously suffering. This evidence is more than sufficient to support an inference that McGirt witnessed her friend's death in the bed next to her and that she endured conscious physical suffering from her own gunshot injuries. It is therefore sufficient to support the district court's finding that Lucilla McGirt's murder was heinous, atrocious or cruel. *See e.g., Hancock v. State*, 2007 OK CR 9, ¶ 119–121, 155 P.3d 796, 824 (finding that combination of witnessing friend's shooting followed by being shot oneself and lingering before dying is evidence of heinous, atrocious or cruel aggravating circumstance); *Browning v. State*, 2006 OK CR 8, ¶ 50, 134 P.3d 816, 842–43 (holding that conscious physical suffering may be shown by proving victim lingered in hospital for weeks suffering in pain from wounds inflicted by defendant).

#### 5. *Murder Committed While Serving Sentence for Felony Conviction*

¶ 42 The district court also found that Magnan committed the murders while serving a sentence of imprisonment on a conviction of a felony. Magnan stipulated to the existence of this fact and admitted it during his plea colloquy when he told the district court judge that he was serving a term of supervised release for a federal felony conviction (arson) when he committed the murders. This statement was corroborated by a copy of the judgment and sentence document from the United States District Court for the District of Montana that was introduced at Magnan's preliminary hearing. The evidence is sufficient to establish beyond a reasonable doubt that Magnan committed the killings while serving a sentence of imprisonment on conviction of a felony.

¶ 43 Nevertheless, Magnan's attorneys contend that the trial court's finding of the sentence-of-imprisonment aggravator was improper because it was based on the same conviction as the prior-violent-felony aggravator. According to Magnan's attorneys, this is impermissible double counting of the same evidence. We have expressly rejected this argument in prior cases and are not persuaded that a different result should apply here. *See e.g., Green v. State,* 1985 OK CR 126, ¶¶ 24–26, 713 P.2d 1032, 1039–1041, *overruled on other grounds, Brewer v. State,* 1986 OK CR 55, 718 P.2d 354.

### C. Mitigating Evidence

¶ 44 Magnan's attorneys assert that the Eighth and Fourteenth Amendments to the United States Constitution require that mitigating evidence be presented on behalf of a capital defendant, even against his wishes, to ensure that a death sentence is imposed in a reliable manner. Magnan's attorneys argue, therefore, that despite Magnan's explicit and personal in-court waiver of the right to present mitigating evidence, and despite his refusal to cooperate with trial counsel in developing mitigating evidence, the district court should have ordered trial counsel to independently investigate and present mitigating evidence on his behalf. This claim is foreclosed by our decision in *Wallace v. State,* 1995 OK CR 19, ¶ 18, 893 P.2d 504, 512, where we held that neither the Eighth Amendment nor the mandatory sentence review statute requires that mitigating evidence be presented on a defendant's behalf in sentencing in a death penalty case; all that is required is that a defendant be given the opportunity to present such evidence. We find nothing in counsel's argument nor in the facts of this case that persuades us that *Wallace* was wrongly decided. We therefore decline counsel's invitation to revisit our decision in that case.

¶ 45 The record reflects that Magnan was given the required opportunity to present mitigating evidence and he freely chose not to do so. Specifically, the transcript of the plea hearing shows that the district court judge carefully explained to Magnan that he (the judge) would have to weigh aggravating and mitigating circumstances in arriving at a sentence and that Magnan was entitled to present evidence of mitigating circumstances that "in fairness, sympathy, and mercy may extenuate or reduce the degree of moral culpability or blame." Further, the district court judge engaged in an extended colloquy with Magnan on the subject of mitigation in which the judge explained the importance of evidence of mitigating circumstances and how that evidence would be weighed against the evidence of aggravating circumstances in order to arrive at a sentence that might or might not include the death penalty. Again, at sentencing, the district court judge advised Magnan of the importance of mitigation and offered him the chance to reconsider his waiver and objection to presentation of mitigating evidence. Again, Magnan declined. From this, it is clear that Magnan was afforded the opportunity to present mitigating evidence and he expressly waived that opportunity. Nothing more was required.[4]

---

4. Despite Magnan's waiver of mitigation, the district court nevertheless ordered a presentence investigation report and specifically directed that trial counsel provide input to that report with any mitigating evidence that might be developed without Magnan's assistance. While appellate counsel attack the contents of that report as inadequate, inaccurate, and "worthless as mitigation" (Aplt's Brief at 89), the fact remains that by ordering a presentence investigation report

¶ 46 Nevertheless, despite Magnan's waiver, Magnan's attorneys also contend that 21 O.S.2001, § 701.11 requires a sentencer to weigh mitigating evidence against aggravating circumstances and this makes presentation of mitigating evidence mandatory, even over a defendant's objection or waiver. Counsel argues that § 701.11 must be construed in this manner in order to maintain the constitutionality of Oklahoma's death penalty statute.

¶ 47 Contrary to counsel's assertions, § 701.11 permits imposition of the death penalty only upon the finding of a single statutory aggravating circumstance *"or"* upon a finding that the statutory aggravating circumstance is not outweighed by mitigating evidence. Under a plain reading of this statute and its use of the disjunctive *"or,"* a death sentence may be imposed upon the finding of a statutory aggravating circumstance but, if mitigating evidence has been presented, the death penalty may be imposed only upon the additional finding that the aggravating circumstance outweighs the mitigating circumstances. As counsel note in their brief, the United States Supreme Court has consistently struck down statutes and judicial decisions that prevent a sentencer in a death penalty case from considering and giving effect to mitigating circumstances (See Aplt's Brief at 82, citing *Hitchcock v. Dugger,* 481 U.S. 393, 398–99, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987); *Sumner v. Shuman,* 483 U.S. 66, 77–78, 107 S.Ct. 2716, 2723, 97 L.Ed.2d 56 (1987); *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987)). Because there is nothing in this construction of the statute that prevents a defendant from presenting mitigating evidence, and because there is nothing in our construction of it that prevents the sentencer (judge or jury) from considering and giving effect to mitigating circumstances, *if* evidence of such circumstances has been presented, we are not persuaded that § 701.11 must be read to require presentation of evidence of mitigating circumstances even where a defendant expressly waives or objects to presentation of that evidence.

and directing that mitigation be included in it, the district court did attempt to acquire mitigat-

### D. Other Factors

¶ 48 Magnan's attorneys claim that trial counsel and the prosecutor failed to object to the inadequacy of the factual basis for Magnan's guilty pleas and, according to counsel, this failure produced an arbitrary imposition of the death penalty. This claim is a variation on the argument previously discussed in which Magnan's attorneys directly challenged the factual basis for the guilty pleas. As noted above, this claim is neither jurisdictional nor related to our mandatory sentence review. The claim is therefore waived. *Duty,* 2004 OK CR 20, ¶ 20, 89 P.3d at 1162. Nevertheless, to the extent that it might be argued that an inadequate factual basis for a guilty plea to a capital offense is a factor leading to the arbitrary imposition of a death sentence, we note that we have reviewed the record of this case and find that either Magnan's in-court admissions given during his plea colloquy, or the extensive evidence presented at his preliminary hearing, provided more than sufficient evidence to establish a factual basis for each element of each of the charged crimes.

¶ 49 Magnan's attorneys argue that the death sentence was arbitrarily imposed in his case because trial counsel failed to alert the district court to "significant" problems with the State's case in aggravation. Specifically, Magnan's attorneys complain that trial counsel failed to point out to the judge a discrepancy between the prosecutor's argument that continuing threat was proved when Lucilla McGirt stood up and talked to Magnan, and he shot her, and the prosecutor's allegation that the heinous, atrocious or cruel aggravator was proved by the suffering experienced by McGirt while she was shot lying in bed. We see no arbitrary factor here.

¶ 50 As framed by Magnan's attorneys, the thrust of this complaint is that "defense counsel failed to point out to the trial court judge that the State's case was not supported by hard evidence but was [instead] based on the prosecutor's own statements and interpretations" (Aplt's Brief 95). It is not at all clear what counsel considers as hard evi-

ing evidence over Magnan's waiver and objection.

dence of aggravating circumstances, but as discussed above, the record is replete with Magnan's own in-court admissions and stipulations supporting findings of the various aggravators as well as abundant testimonial and documentary evidence introduced by the State at Magnan's preliminary hearing. This is nothing more than an additional complaint about the sufficiency of the evidence, a claim we have already addressed.

¶ 51 As a corollary to this claim, Magnan's attorneys assert that trial counsel should have instructed the judge that statements of counsel are not evidence. This is a frivolous argument. Unlike jurors, a judge is presumed to know the law, and presumably in this instance, the judge as the trier of fact was aware that statements and argument of counsel are not evidence. *See e.g., Long v. State,* 2003 OK CR 14, ¶ 4, 74 P.3d 105, 107 ("[w]e presume, when a trial court operates as the trier of fact, that only competent and admissible evidence is considered in reaching a decision"); *Martin v. State,* 1976 OK CR 65, ¶ 13, 547 P.2d 396, 399 ("[i]n a case where a jury is waived and the cause tried to the court, the presumption is that the court in arriving at [its] decision and rendering judgment considered only that evidence which is competent and admissible and which has a material bearing on the issues of the case and disregarded incompetent evidence which was admitted" (quoting *Capshaw v. State,* 1940 OK CR 78, 104 P.2d 282 (syllabus), 69 Okla.Crim. 440, 104 P.2d 282 (syllabus))).[5] We see nothing in the record even remotely suggesting that the trial court judge based his findings of continuing threat or heinous, atrocious or cruel aggravators on a mistaken idea that the prosecutor's statement constituted evidence.

¶ 52 In connection with this proposition, Magnan's attorneys also assert generally that "[d]efense counsel failed to comment on the State's argument the court should consider a number of incidences that were not relevant to any aggravators" (Aplt's Brief 95). Counsel do not point to any specific instance in the record where the State urged

the trial court judge to consider irrelevant evidence, and our review of the record fails to disclose any such improper exhortations. We find no merit to this claim.

¶ 53 Magnan's attorneys contend next that the district court judge arbitrarily imposed the death penalty as a result of having been influenced by improper argument by the prosecutor. Counsel complain specifically about an argument by the prosecutor in which the judge was asked to consider the litigation costs to society that would be incurred if he did not impose the death penalty. The record shows that this argument was a direct response to Magnan's own exhortation to the court that he (Magnan) would appeal any sentence other than death. The argument was a fair response to a litigation threat issued by Magnan himself in open court.

¶ 54 Magnan's attorneys also contend that it was improper for the prosecutor to argue that the judge should consider Magnan's actions in enlisting others to assist him in the events leading up to the murders and that the court should consider evidence that Magnan secured the assistance of his accomplices through intimidation. Magnan's attorneys further assert that it was improper for the prosecutor to ask the judge to consider the negative impact that the coerced participation of accomplices had on the accomplices and their families.

¶ 55 Counsel offer no explanation or authority as to why this line of argument was improper; nor do counsel explain how this argument influenced the judge to arbitrarily impose the death penalty. If the circumstances surrounding a crime show that the defendant was a leader or organizer of the criminal activity, then the defendant's leader-organizer role is a relevant indicator of culpability and should be considered in tailoring a sentence to fit the circumstances of the offender and the offense. *See e.g., Bryson v. State,* 1994 OK CR 32, ¶ 84, 876 P.2d 240, 266 (explaining that where defendant enlists accomplices to assist in carrying out murder plan, defendant's leadership role warrants

---

5. This point of law is well ensconced in our law as one of the standard uniform jury instructions that district court judges issue every day in every

criminal jury trial in this State. *See* OUJI–CR2d 1–8 (Opening Instruction)("No statement or argument of the attorneys is evidence").

consideration in imposing death penalty); *Brogie v. State*, 1985 OK CR 2, ¶¶ 42–45, 695 P.2d 538, 548 (citing defendant's leadership role in organizing murder as relevant to justifying imposition of death penalty). The argument was neither improper nor unfairly prejudicial.

¶ 56 Magnan's attorneys complain that the trial court judge improperly agreed to the joint request of the prosecutor and Magnan's trial attorney that the court incorporate into Magnan's sentencing proceeding, the victim impact testimony given at the sentencing of his co-defendant Aaron Wolf. The victim impact witnesses in that proceeding were shooting survivor Eric Coley, Lucilla McGirt's sister, and Lucilla McGirt's daughter. Coley said a fifteen year sentence for Wolf would be appropriate in his view, but said nothing with respect to Magnan. McGirt's sister testified that she observed McGirt in pain in the hospital in the days after the shooting. She offered her opinion that the death penalty would be appropriate for Aaron Wolf. She expressed no opinion with regard to Magnan. McGirt's daughter also testified that she observed McGirt in the hospital in the days after the shooting and that her mother was suffering. She offered the opinion that a life sentence would be appropriate for Aaron Wolf, but expressed no view about Magnan. Magnan's attorneys contend the testimony of these three witnesses caused the district court to arbitrarily impose the death penalty.

¶ 57 We have reviewed the transcript of the victim impact testimony. That testimony was brief, concise, relatively unemotional, and limited to establishing the pain and suffering of Lucilla McGirt, the financial costs of medical treatment for Eric Coley, the emotional impact of McGirt's death on her family, and the victims' opinions as to appropriate punishment. These are all permissible bases for victim impact testimony when that testimony is presented in a brief, concise, and relatively unemotional manner, as was done here. 22 O.S.2001, § 984(A); *Lay v. State*, 2008 OK CR 7, ¶ 26, 179 P.3d 615, 623; *DeRosa*, 2004 OK CR 19, ¶ 77, 89 P.3d at 1151. We find nothing in this record showing that the district court judge was influenced by this testimony to arbitrarily impose the death penalty.

¶ 58 In connection with this claim, Magnan's attorneys also assert that while it might arguably have been appropriate for the judge to admit a transcript of the victim impact testimony from co-defendant Wolf's sentencing hearing, it was error for the judge to take notice of the testimony by relying on his memory of the proceeding. This claim is patently frivolous. We decline to hold that it is error for a judge to rely on his memory to take notice of testimony he heard firsthand in a proceeding in his courtroom.

## DECISION

¶ 59 Under the mandate of 21 O.S.2001, § 701.13(C)(1) we have reviewed the record of this case and find that the sentence imposed was based upon aggravating circumstances supported by the evidence and not under the influence of passion, prejudice, or any other arbitrary factor. We further find that the record supports a conclusion that Magnan's waiver of his right to a jury trial, presentation of mitigating evidence, and his right to a direct appeal of his Judgment were all made knowingly, intelligently, and voluntarily. The Judgments and Sentences are **AFFIRMED.**

¶ 60 Magnan has ninety days from the issuance of mandate in this case to file a petition for writ of certiorari with the United States Supreme Court. If he fails to timely file such a petition, and no application for post conviction relief is pending in this Court, this Court will set a date for execution of the judgment thirty days after that time condition is not met. 22 O.S.Supp.2005, § 1001.1(A).

¶ 61 Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2009), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

C. JOHNSON, P.J., LUMPKIN and LEWIS, JJ.: concur.

CHAPEL, J.: dissent.

CHAPEL, J., dissenting.

¶ 1 In Proposition I Magnan claims the state of Oklahoma has no jurisdiction to prosecute him because the murders were committed on Indian land. The majority concludes that the crime scene was not on Indian land and the State had criminal jurisdiction. I disagree.

¶ 2 We remanded the case for an evidentiary hearing on this issue. The district court heard evidence from an experienced title examiner attorney, a Superintendent of the Wewoka Agency, Bureau of Indian Affairs (BIA), a Field Solicitor for the Department of the Interior representing the BIA, and the former Deputy Commissioner for Indian Affairs. These witnesses explained in great detail and with documentation why, in their opinion and the opinion of the Bureau of Indian Affairs, the land in question is restricted Indian land. I find their expert arguments persuasive. No evidence before this Court suggests the land is anything other than restricted Indian land.

¶ 3 Three separate legal proceedings, in three separate cases over the course of almost forty years, have examined the status of the land where the crimes were committed. However, neither the District Court in this case, nor the federal court in the *Wood* case, truly made an independent assessment of the evidence presented to them. It is my opinion that they could not have done so, as the expert evidence before them indicated that the property is considered restricted land by the BIA and thus would be outside Oklahoma's jurisdiction. Rather than basing their conclusions on the evidence presented to them, both those courts ultimately rely on a 1970 proceeding in the District Court of Seminole County in which Kizzie Tiger Wolf conveyed the surface rights of the property to the Seminole Nation Housing Authority. That conveyance purported to be in fee simple. The federal experts and the title examiner here all testified that conveyance was improper under federal law.

¶ 4 The issue turns on the procedures for conveyance governing the types of ownership interest Tiger Wolf had in the property. Everyone agrees that she had a 1/5 heirship interest, and purchased a 4/5 interest. The federal experts have consistently testified that the applicable federal law treats heirship and purchase interests separately for purpose of conveyance. Heirship interests may be conveyed, under certain circumstances, without restriction. Purchase interests are restricted, and any conveyance of purchase interests must be approved by the Secretary of the Interior or his designee. The record shows that the Area Director for the BIA was a designee authorized to approve purchase conveyances at the time of the 1970 Seminole County District Court proceeding. However, nothing in the record indicates that Tiger Wolf's purchase interest conveyance was approved by either the BIA Area Director or the Secretary of the Interior. In fact, the record indicates that it was not.

¶ 5 The Area Director of the BIA and the Department of the Interior both received notice of the 1970 proceedings. The majority here, like the federal court in *Wood*, rely on the fact that Dean Storts, a Trial Attorney for the Department of the Interior, acknowledged receipt of the notice, appeared in the District Court of Seminole County, and did not object to the 1970 conveyance. However, testimony at the evidentiary hearing shows that Storts's appearance did not, as the majority holds, satisfy the legal requirements necessary for a proper conveyance of the purchase interest. As a Department of Interior Trial Attorney Storts could represent the federal government's interest insofar as the proceedings were conducted under the statute governing Tiger Wolf's 1/5 heirship interest. He was not delegated to act on the Secretary of the Interior's behalf and approve any conveyance conducted under the statute governing conveyance of the 4/5 restricted purchase interest. His agreement to the proceeding could only have covered the 1/5 heirship interest. The 4/5 restricted purchase interest was still subject to the statute restricting the property subject to approval by the Secretary of the Interior.[1] Thus, the

---

1. I note that Tiger Wolf's probate attorney testified that, at her death in 1991, the Final Decree determining heirs shows the 4/5 purchase interest was restricted. The Decree was based on information in records supplied by the Office of

record shows that Storts's presence did not provide authority for the conveyance. Contrary to the majority's conclusion, the 1970 conveyance could not have met the statutory requirements. The fact that the District Court of Seminole County clearly intended a conveyance of the entire property in fee simple is not controlling if that court did not have jurisdiction over all the various property interests.[2] As a matter of law, if conveyance of the 4/5 restricted purchase shares was not approved by the Secretary of the Interior, the state district court did not have jurisdiction over the conveyance.

¶ 6 The evidence presented at the evidentiary hearing, like the evidence presented to the federal court in *Wood*, shows that the 1970 Seminole County conveyance was not proper and 4/5 of the interest in the property is still restricted. This makes the property Indian land for jurisdictional purposes. Because I believe the property itself is not within Oklahoma criminal jurisdiction, I do not reach the argument concerning mineral interests.

¶ 7 The majority states that with the *Wood* decision the United States ceded criminal jurisdiction over this property. For this Court's purposes, that was true only for the *Wood* case. I believe the *Wood* case was wrongly decided, based as it was on a state district court conveyance which was improper and not authorized by federal law. This Court may choose to find the *Wood* decision persuasive in this case, as the majority does. However, I believe we should not rely on an incorrect legal conclusion, no matter how close the issue it presents is to the issue before us.

¶ 8 The majority suggests that, if we accept the testimony in this case and decline jurisdiction, no sovereign will have criminal jurisdiction over the property. That may be the case; it is also possible that if we decline jurisdiction the federal courts may reconsider their position should the issue be presented to them regarding this case. I also note that

the Field Solicitor of the Department of the Interior.

2. The 1970 hearing was very brief, and revolved around Tiger Wolf's desire to convey her land to

neither the record nor the majority discuss the possibility of tribal jurisdiction over this property. In any event, our decision to grant or decline jurisdiction must be based, not on the position of any other sovereign, but on whether Oklahoma in fact has jurisdiction. It appears to me from the record of the evidentiary hearing that we do not. I dissent.

the Housing Authority, which promised to build her a house and return the property. At no time was any issue of the nature of Tiger Wolf's property interests raised or decided.